**REVISED February 1, 2018**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-20691

United States Court of Appeals
Fifth Circuit

**FILED**

January 31, 2018

Lyle W. Cayce
Clerk

LEGACY COMMUNITY HEALTH SERVICES, INCORPORATED,

Plaintiff–Appellee,

versus

CHARLES SMITH, in His Official Capacity as
  Executive Commissioner of Health and Human Services Commission,

Defendant–Appellant.

Appeal from the United States District Court
for the Southern District of Texas

Before JONES, SMITH, and PRADO, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Legacy Community Health Services ("Legacy")—a Federally Qualified Health Center ("FQHC")—sued the Texas Health and Human Services Commission (the "Commission"), through its Executive Commissioner, alleging

No. 16-20691

that Texas's reimbursement scheme violated the Medicaid Act (1) by requiring Managed Care Organizations ("MCOs") fully to reimburse FQHCs, (2) by failing to ensure that Texas itself would reimburse an FQHC if an MCO does not reimburse the FQHC in the first place, and (3) by withholding payments for certain non-emergency services that Legacy has been providing to the enrollees of an MCO with which Legacy has no contract. The district court granted Legacy summary judgment on all of its claims. We reverse and remand, concluding that (1) the Commission's requirement that MCOs fully reimburse FQHCs does not violate the Medicaid Act; (2) Legacy lacks standing to challenge the Commission's lack of a policy that the state directly reimburse an FQHC if it is not fully reimbursed by the MCO; and (3) Legacy is not entitled to reimbursement for the non-emergency, out-of-network services about which it complains.

## I.

## A.

FQHCs are designed to provide care to medically underserved populations. 42 U.S.C. § 254b(a), (e), (k). FQHCs have two sources of compensation: federal grants under § 330 of the Public Health Service Act ("PHSA"), 42 U.S.C. § 254b, for medically underserved communities and state reimbursements for Medicaid services, *id.* § 1396a(bb). MCOs are private organizations that arrange for the delivery of healthcare services to individuals who enroll with them. *See id.* §§ 1396u-2(a)(1)(A), 1396b(m). As relevant here, they act as intermediaries between the state and FQHCs. The state disburses funds to an MCO, which then contracts with FQHCs and reimburses them for the services they provide to the MCO's enrollees. *See id.* § 1396b(m)(2)(A)(ix); 42 C.F.R. § 438.2. The Medicaid Act is managed by the Centers for Medicare and Medicaid Services ("CMS").

2

No. 16-20691

States are required to reimburse FQHCs for their covered Medicaid services. 42 U.S.C. § 1396a(bb). They may either reimburse the FQHCs directly or use MCOs to reimburse the FQHCs. *Id.* § 1396u-2(a). Before 1997, the law allowed either the state or the MCO fully to assume this reimbursement requirement. The Balanced Budget Act of 1997, however, changed that and provided the statutory provisions relevant here: 42 U.S.C. §§ 1396a(bb) and 1396b(m).

Section 1396a(bb) provides that the state is obligated to ensure that FQHCs are reimbursed for covered Medicaid services. It generally requires that "the State plan shall provide for payment for services described in section 1396d(a)(2)(C) . . . furnished by [FQHCs]." § 1396a(bb)(1). That section also sets forth the framework for assessing reimbursement amounts: the Prospective Payment System ("PPS"). § 1396a(bb)(1)–(4).

Section 1396b(m) contains the requirements for contracts between states and MCOs. If the state elects to use MCOs to pay the FQHCs, then the Medicaid Act mostly leaves the MCOs free to negotiate and contract with FQHCs. But § 1396b(m) requires the MCO to "provide payment that is not less than the level and amount of payment which the [FQHC] would make" if it were not an FQHC—*i.e.*, the MCO must pay the FQHC at least competitive market rates. § 1396b(m)(2)(A)(ix).[1]

This can lead to shortfalls for the FQHC, which may be entitled under § 1396a(bb) to a PPS amount greater than what the MCO pays. In that event, § 1396a(bb) requires the state to "provide for payment to the [FQHC] by the State of a supplemental payment equal to the amount (if any)" of the difference

---

[1] When the Balanced Budget Act was passed, CMS issued a State Medicaid Director Letter ("SMDL") that took the position that states cannot impose any requirements other than those within § 1396b(m)—*i.e.*, CMS claimed that states cannot require an MCO to pay *more* than a competitive market rate. For reasons we will explain, we reject that position.

between the MCO's payment and the required PPS amount. § 1396a(bb)(5)(A). These are sometimes called "wraparound" payments. The parties dispute, however, whether a state can require the MCO to pay the full PPS amount in the first instance, thereby obviating the need for such supplemental "wraparound" payments.

Furthermore, § 1396a(bb) provides for "[a]lternative payment methodologies" ("APM"). *Id.* § 1396a(bb)(6). Under these APMs, a state may "provide for payment" under any kind of mechanism that is both "agreed to by the State and [FQHC and] . . . results in payment to the [FQHC] of an amount" at least equal to the PPS. *Id.*

Finally, § 1396b(m) addresses situations in which a patient, enrolled with a certain MCO, goes to an FQHC that has not contracted with that MCO. These "out-of-network" claims are treated slightly differently from "in-network" claims (*i.e.*, where the MCO has a contract with the FQHC). Generally, the MCO has no reimbursement obligations to the FQHC for out-of-network claims. But § 1396b(m)(2)(A)(vii) requires that all state-MCO contracts address out-of-network services that "were immediately required due to an unforeseen illness, injury, or condition." The state-MCO contract must designate whether the state or the MCO will reimburse the FQHC for such out-of-network emergency services. *Id.* The parties also dispute whether the state must independently reimburse the FQHC for other, non-emergency out-of-network services, not covered by § 1396b(m)(2)(A)(vii). *See also id.* § 1396a(bb).

## B.

The Commission manages Texas's Medicaid program ("the program"), TEX. GOV'T CODE § 531.021(a), and has elected to contract with MCOs to provide Medicaid services, *id.* § 533.002. One such MCO is the Texas Children's

Health Plan ("TCHP"). Legacy—designated an FQHC for purposes of Medicaid reimbursement and Section 330 grants—formed a contract with TCHP in 2009 that specified that Legacy would provide medical care to TCHP's members and that TCHP would pay Legacy $67 per-patient visit, below Legacy's PPS rate.

In 2011, the Commission amended its contract with TCHP, requiring TCHP to pay FQHCs their full PPS rate instead of the rates that TCHP had negotiated with its FQHCs. Legacy and TCHP amended their contract to mirror that change: TCHP would pay Legacy its full PPS rate of about $270 per visit. Furthermore, the Commission gave FQHCs the option to keep the traditional PPS or calculate its rates using an alternative PPS ("APPS"); Legacy elected to use the APPS. At that time, Texas still provided that it would make supplemental payments if the MCO's payment was less than the required PPS amount. *Cf.* § 1396a(bb).

From 2011 to 2014, Legacy's Medicaid encounters and costs skyrocketed. For instance, its Medicaid encounters increased by 246%, and its claims expenses per month increased by 283%. For the 2014 fiscal year, TCHP paid about $20 million to all FQHCs with which it had contracted. Of that amount, it paid Legacy over $12 million, even though only 2.7% of TCHP's office visits occurred at Legacy, and less than 2% of TCHP's Medicaid enrollees selected Legacy as their primary care provider. Though TCHP maintained contracts with numerous other FQHCs and accused Legacy of effectively gaming the Medicaid system, TCHP indicated to Legacy that it wanted the state to reinitiate supplemental "wraparound" payments to allow TCHP to give lower initial reimbursements. But because Legacy's utilization trend exceeded the Medicaid premium trend and other FQHC trends, TCHP ultimately terminated its contract with Legacy effective February 2015.

No. 16-20691

Since Legacy's contract was terminated with TCHP, Legacy has continued to provide services to patients who have TCHP as their provider. Accordingly, Legacy submitted approximately 6,000 "out-of-network" claims to TCHP between February and August 2015. TCHP denied nearly half of those claims as (1) lacking prior authorization and (2) not relating to emergency services. Legacy appealed those denials to the Commission, but Texas has similarly refused to reimburse Legacy for those claims, contending that the Medicaid Act does not entitle Legacy to receive payment for such out-of-network services.

After Legacy filed this suit, Texas changed its Medicaid policies. In January 2016, the Commission submitted to the CMS a state plan amendment ("SPA 16-02") that eliminates the requirement that Texas make supplemental "wraparound" payments to FQHCs in the event that the MCOs fail fully to reimburse the FQHCs at their PPS rate. Furthermore, SPA 16-02 specified that MCOs would fully reimburse FQHCs. CMS approved the amendment.

C.

In January 2015, Legacy sued the Commission under 42 U.S.C. § 1983, alleging that it had violated its rights under 42 U.S.C. § 1396a(bb). Legacy offered two theories.

First, Legacy contended that the Commission had unlawfully delegated its FQHC reimbursement obligations to MCOs by requiring them to reimburse FQHCs fully. Legacy's underlying theory is that the purpose of §§ 1396a(bb) and 1396b(m)(2)(A) is to allow FQHCs to negotiate freely with MCOs for above-market, but below-PPS, rates and thereby encourage FQHC-MCO contracts. The Commission countered that nothing in the text of either § 1396a(bb) or § 1396b(m)(2)(A) prevented the state from requiring MCOs to reimburse FQHCs fully.

6

No. 16-20691

Second, Legacy asserted that the Commission had failed to ensure payment for certain out-of-network services, in violation of 42 U.S.C. § 1396b-(m)(2)(A)(vii). Texas replied that the Commission had ensured reimbursement for the kind of emergency out-of-network services contemplated by § 1396b(m)-(2)(A)(vii) and that the Medicaid Act did not require reimbursement for any other out-of-network services.

Texas moved to dismiss, averring that Legacy lacked standing and a cause of action under § 1983. The district court denied the motion. Legacy and Texas then cross-moved for summary judgment. After those motions were filed, SPA 16-02 was enacted and approved. The court ordered supplemental briefing on the effect of CMS's approval of SPA 16-02 on the pending litigation; Legacy's brief and Texas's reply were framed in terms of whether *Chevron* deference should be accorded to that approval.

The district court then issued two opinions on the cross-motions for summary judgment. In the first, the court held that the Commission's policy violated § 1396a(bb) (1) by eliminating its requirement to make supplemental "wraparound" payments, thereby failing to ensure reimbursement of FQHCs and (2) by requiring MCOs to fully reimburse FQHCs.

CMS then issued a "statement of interest," clarifying its position on § 1396a(bb) as follows: (1) States may not "simply do away with their obligation to make supplemental payments"; (2) the state may eliminate the need for supplemental payments through an APM under § 1396a(bb)(6); (3) CMS approved SPA 16-02 as an APM but had not determined whether the FQHCs had given the requisite consent to make SPA 16-02 a valid APM, so SPA 16-02 would be valid only if there were proper FQHC consent; and (4) the state is similarly obligated to ensure that FQHCs are fully reimbursed for out-of-network emergency services.

No. 16-20691

Reviewing that statement, the district court issued its second opinion, holding that the Commission's out-of-network policy violated § 1396a(bb) because it failed to reimburse Legacy for non-emergency out-of-network services. The court then enjoined the Commission.

## II.

We first decide whether the district court had Article III jurisdiction. Federal courts have jurisdiction only over a "case" or "controversy." *See* U.S. CONST. ART. III, § 2, cl. 1. To establish a "case or controversy," a plaintiff must establish that it has standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Accordingly, Legacy must demonstrate that (1) it has suffered an "injury in fact," which is "an invasion of a legally protected interest" that is "concrete and particularized" and "actual and imminent" rather than "conjectural or hypothetical," (2) there is a "causal connection between the injury and the conduct complained of" such that the injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court," and (3) the injury will likely "be redressed by a favorable decision." *Id.* (internal quotations, brackets, ellipses, and citations omitted).

If, as here, a plaintiff seeks injunctive relief, it must also show that "there is a real and immediate threat of repeated injury." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (citation omitted).[2] Past injury alone is insufficient; the plaintiff must show a "real or immediate threat that the plaintiff will be wronged again." *Id.* at 111. Moreover, "each element of Article III standing 'must be supported in the same way as any other matter on which the plaintiff

---

[2] Neither party briefed the requirements of injunctive relief or discussed the issue of Legacy's standing to challenge SPA 16-02, discussed *infra*. But standing is jurisdictional and should be addressed "when there exists a significant question about it." *K.P. v. LeBlanc*, 627 F.3d 115, 122 (5th Cir. 2010) (addressing standing sua sponte).

No. 16-20691

bears the burden of proof,'" with the same evidentiary requirements of that stage of litigation. *Bennett v. Spear*, 520 U.S. 154, 167–68 (1997) (quoting *Lujan*, 504 U.S. at 561). Thus, at the summary judgment stage, Legacy must "'set forth' by affidavit or other evidence 'specific facts' to survive a motion for summary judgment." *Id.* at 168 (quoting Fed. R. Civ. P. 56(c)).

"[S]tanding is not dispensed in gross"; a party must have standing to challenge each "particular inadequacy in government administration." *Lewis v. Casey,* 518 U.S. 343, 357–58 & n.6 (1996). Thus, Legacy must show standing to challenge each alleged deficiency in Texas's remedial scheme. As we explain below, Legacy has established standing to challenge both Texas's requirement that MCOs fully reimburse FQHCs and the state's refusal to reimburse Legacy for non-emergency out-of-network services. But Legacy has not established standing to challenge SPA 16-02's lack of a requirement that Texas provide supplemental "wraparound" payments.

A.

Legacy has standing to challenge the Commission's in-network policy of requiring MCOs fully to reimburse FQHCs. It has shown injury in fact, causation, and redressability (as well as a threat of future injury).

1.

Legacy's first and primary alleged injury is the loss of its contract with TCHP, which Legacy traces to the Commission's policy of requiring MCOs fully to reimburse FQHCs. As Legacy notes, its contract with TCHP yielded about $14 million for Legacy, and the termination of that contract has resulted in some lost revenue and patients. Second, Legacy maintains that the Commission's policy remains a barrier to any future contractual relationship between Legacy and TCHP (or other MCOs, which are all subject to the same

policy).

Texas disputes that this injury can establish standing, maintaining that Legacy has not shown a true "injury in fact" because it has been paid its full PPS rate and has no right to a contract with TCHP. This overstates what is required for an injury in fact. Legacy has suffered a "'direct pecuniary injury' that generally is sufficient to establish injury-in-fact." *K.P. v. LeBlanc*, 627 F.3d 115, 122 (5th Cir. 2010). Moreover, the fact that Legacy did not have a *right* to contract with TCHP is immaterial; there can be injury-in-fact where a governmental entity erects barriers to private contracting or deprives a party of its rightful bargaining position.[3]

Legacy's alleged injury is analogous to that in *Clinton*, 524 U.S. at 432–33. There, the Court held that plaintiffs who sought to acquire processing plants had standing to challenge the cancellation of a tax benefit for acquiring such plants. *Id.* The reason was that the tax benefit was "the equivalent of a statutory 'bargaining chip' . . . [to] purchase . . . such assets," and the loss of that bargaining chip "inflicted a sufficient likelihood of economic injury." *Id.* at 432. Legacy stands in a materially similar situation to the circumstance those plaintiffs. According to Legacy, the Medicaid Act confers on it a right freely to negotiate with MCOs for contracts (at least with a market-rate floor) in a way that is meant to incentivize MCO-FQHC contracts.[4] Thus, even if incorrect, Legacy is suing to recover this "bargaining chip" in its negotiations

---

[3] *See, e.g.*, *Clinton v. City of N.Y.*, 524 U.S. 417, 432–33 (1998) (finding standing where the President had canceled a tax benefit to facilitate the acquisition of processing plants); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 261–63 (1977) (finding standing where a zoning board had refused to rezone so that a developer could build houses).

[4] *See* 42 U.S.C. §§ 1396a(bb)(5), 1396b(m)(2)(A)(ix); *cf. Cmty. Health Care Ass'n of N.Y. v. Shah*, 770 F.3d 129, 150 (2d Cir. 2014) (stating that the purpose of the provision is to incentivize "MCOs to contract with FQHCs").

with the MCOs.[5]  Therefore, Legacy has alleged a proper injury in fact as to this MCO reimbursement policy.

2.

Legacy's injury is traceable to the Commission's policy.  Texas maintains that the loss of Legacy's contract with TCHP was a result of Legacy's misconduct and thus was not caused by the policy.  Admittedly, Legacy would not have standing if it were purely speculative as to whether the policy made TCHP more likely to terminate the TCHP-Legacy contract.  *See Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 43–46 (1976).  But that is not the situation.  Legacy has provided e-mails from TCHP indicating that TCHP wanted Texas to re-initiate wraparound payments.  Thus, although TCHP ultimately terminated because of Legacy's high PPS rates, it is far from speculative to say that the Commission's policy impacted that decision.[6]  Indeed, TCHP objected to Legacy's rates only after the Commission had changed its policy to require TCHP to cover Legacy's full PPS amount.

Additionally, Legacy's loss of its proper bargaining position is obviously the result of the Commission's policies.  According to Legacy's theory of the merits, the Commission's policies directly undermine Legacy's ability to negotiate freely with MCOs and therefore deprive Legacy of its rightful "bargaining chip."[7]  That injury is directly traceable to the Commission insofar

---

[5] *See Grant ex rel. Family Eldercare v. Gilbert*, 324 F.3d 383, 387 (5th Cir. 2003) (stating that standing should be considered separately from the merits).

[6] *See K.P.*, 627 F.3d at 123 (explaining that government actions that pose barriers to negotiation and "significantly contributed to the" plaintiff's injuries are considered causes of those injuries); *see also Bennett*, 520 U.S. at 168–71 (finding that an opinion by the Fish and Wildlife Service that would have a "powerful coercive effect" on an agency's action to harm the plaintiffs fairly caused their injury).

[7] *Cf. Clinton*, 524 U.S. at 432–33 (reasoning that a tax benefit can be "the equivalent of a statutory 'bargaining chip' . . . [to] purchase . . . such assets").

No. 16-20691

as the injury and policy are merely different sides of the same coin. *See Clinton*, 524 U.S. at 432–33.

3.

Legacy has shown redressability and a threat of future injury, but not as to its contract with TCHP. Legacy rightly notes that in certain situations the removal of a substantial barrier to forming a contract will satisfy redressability. *See, e.g., Bennett*, 520 U.S. at 169–71; *Vill. of Arlington Heights*, 429 U.S. at 261–62. But Legacy must also show that, if the barrier is removed, the injury is likely to be redressed—in this case, that the contract is likely to be restored. This Legacy has not done. There is nothing in the record to indicate ongoing contractual negotiations between Legacy and TCHP or anything to establish that Legacy is likely to regain its contract with TCHP.

But there is Legacy's second alleged injury: the loss of its statutory "bargaining chip" with TCHP and the many other MCOs with whom Legacy has or may one day have contracts. *See Clinton*, 524 U.S. at 432–33. As to that injury, Legacy has certainly established redressability. A favorable court ruling would return to it that "bargaining chip" and would redress that injury. Moreover, because Legacy has already traced one lost contract to the Commission's policy, the loss of this "bargaining chip" has "inflicted a sufficient likelihood of economic injury." *Id.* at 432. And because this injury is ongoing and will relate to Legacy's future contractual dealings, it has shown the kind of "real and immediate threat of repeated injury" for injunctive relief. *Lyons*, 461 U.S. at 102 (citation omitted).[8] Accordingly, Legacy has standing to bring its "in-network" challenge to the policy of requiring MCOs to reimburse FQHCs fully.

---

[8] Indeed, Legacy maintains that the Commission's policy will stand as a barrier to any future contractual relationship with other MCOs. And the record indicates that Legacy has been expanding and hopes to continue expansion in the future. As an FQHC, Legacy thus undoubtedly will have future dealings with MCOs.

12

No. 16-20691

B.

Legacy has established standing as to the Commission's out-of-network policy of reimbursing FQHCs only for emergency services covered by § 1396b-(m)(2)(A)(vii) instead of for a wider range of services. Legacy easily meets the injury-in-fact requirement: If its theory is correct, then it has not received payment to which it is entitled. Texas's response to this injury—that Legacy has not identified any claims to which it is entitled and for which it was not reimbursed—conflates the merits of the case with standing.[9]

Furthermore, there is plainly causation and redressability. The lack of payment stems from Texas's refusal to issue these reimbursements. And if we grant Legacy the injunctive relief it seeks, Texas will be required to issue those payments. Finally, the injury is ongoing; Legacy seems to be providing these services currently without reimbursement. Accordingly, there is a clear threat of future injury warranting injunctive relief should Legacy prevail on the merits. Therefore, it has standing to challenge the Commission's out-of-network policy of reimbursing FQHCs only for emergency Medicaid services.

C.

Consequently, Legacy has established standing to challenge the Commission's out-of-network policy and its requirement that MCOs fully reimburse FQHCs. Yet we must independently examine whether Legacy has standing to challenge the Commission's refusal to reimburse FQHCs with supplemental "wraparound" payments if an MCO fails to reimburse the FQHC fully. This policy, which was enacted as part of SPA 16-02, was gratuitously enjoined by the district court even though SPA 16-02 was enacted after Legacy initiated this litigation. Although Legacy had standing to bring its initial challenges to

---

[9] *See Grant ex rel. Family Eldercare*, 324 F.3d at 387 (stating that standing should be considered separately from the merits).

the requirement that MCOs fully reimburse FQHCs and to the lack of re-imbursement for non-emergency out-of-network services, Legacy lacks standing to challenge this portion of SPA 16-02.

A plaintiff that has "demonstrated harm from one particular inadequacy in government administration" does not automatically have the right to challenge the entirety of the government's administrative scheme. *Casey*, 518 U.S. at 357–58 & n.6. Put another way, "a plaintiff who has been subject to injurious conduct of one kind [does not] possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject." *Blum v. Yaretsky*, 457 U.S. 991, 999 (1982).[10]

Accordingly, in *Yaretsky* the Court found that the plaintiffs had standing to challenge the procedural adequacy of their nursing homes' discharges or transfers to *lower* levels of care—but *lacked* standing to challenge those pro-cedures with respect to discharges or transfers to *higher* levels of care. *Id.* at 1000–01. "[T]he threat of transfers to *higher* levels of care" lacked "suffici-ent immediacy and reality" because "[n]othing in the record . . . suggest[ed] that any of the individual [plaintiffs] have been either transferred to more in-tensive care or threatened with such transfers." *Id.* at 1001. Although it was "not inconceivable that [plaintiffs would] one day confront this eventuality," "assessing the possibility now would 'tak[e] us into the area of speculation and conjecture.'" *Id.* (citation omitted).

---

[10] *See also Davis v. Fed. Election Comm'n*, 554 U.S. 724, 733–34 (2008) (explaining that "[t]he fact that [plaintiff] has standing to challenge § 319(b) does not necessarily mean that he also has standing to challenge the scheme of contribution limitations that applies when § 319(a) comes into play"); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 350–53 (2006) (rejecting an attempt to challenge state taxes on the basis of taxpayer standing); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000) (noting that "a plaintiff must demonstrate standing separately for each form of relief sought"); *Nat'l Fed'n of the Blind of Tex., Inc. v. Abbott*, 647 F.3d 202, 209 (5th Cir. 2011) (holding that plaintiffs had standing to challenge a flat-fee provision but lacked standing to contest a materially identical percentage provision).

No. 16-20691

Legacy's position is similar to that of the *Yaretsky* plaintiffs. The harm that Legacy suffers from the policy of requiring MCOs to reimburse FQHCs fully is quite distinct from any harm it might suffer from the Commission's declining to require supplemental payment. As explained above, Legacy can establish standing to challenge the former policy because it has lost a statutory "bargaining chip," *i.e.*, the ability to negotiate freely with MCOs for below-PPS but above-market rates. And Legacy has shown that this "bargaining chip" may affect it because it already lost one contract—the TCHP contract—partially because of the policy of limited reimbursement.

But that injury is wholly unrelated to any requirement (or lack thereof) that Texas reimburse FQHCs if the MCO fails to do so. This latter policy does not affect Legacy's bargaining position with TCHP or any other MCO; nor could it relate in any way to TCHP's decision to terminate Legacy's contract, given that SPA 16-02 was enacted after the contract was terminated. Finally, the policies are "sufficiently different" such that standing for each must be independently established. *Id.* One policy deals with how MCOs are to reimburse FQHCs in the first instance; the other addresses Texas's supplemental-reimbursement obligations. It is obvious that any injuries flowing from one policy would be different from those arising from the other.

Thus, Legacy must independently demonstrate standing to challenge Texas's lack of a supplemental reimbursement policy. This it cannot do. The only possible injury Legacy could assert would be that it now is at risk of not receiving full reimbursement. Yet "[a]bstract injury," such as risk alone, is insufficient to confer standing. *Lyons*, 461 U.S. at 101. Instead, Legacy must show that it "has sustained or is immediately in danger of sustaining some direct injury." *Id*. at 102. But as Texas points out repeatedly, Legacy has failed to identify a single instance in which it was not reimbursed at its full PPS rate

15

No. 16-20691

from TCHP.[11] As in *Yaretsky*, it is "not inconceivable that [Legacy] will one day confront [the] eventuality" of failing to receive full reimbursement, but "assessing [that] possibility now would 'tak[e] us into the area of speculation and conjecture.'" *Yaretsky*, 457 U.S. at 1001 (citation omitted).

Therefore, Legacy is without standing to challenge the Commission's lack of a requirement that Texas reimburse FQHCs with supplemental "wrap-around" payments if the MCO fails to reimburse the FQHC at the full PPS rate. The district court should not have enjoined Texas as to this policy.

## III.

On the merits, we agree with the district court that Legacy may sue under 42 U.S.C. § 1983, which confers a private right of action on those who suffer deprivations of "any rights, privileges, or immunities secured by" federal law. Not every federal law is actionable under § 1983, however. A plaintiff must "assert the violation of a federal *right*, not merely a violation of federal *law*." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 282 (2002) (citation omitted). Thus, the particular statute must provide "an unambiguously conferred right" with an "*unmistakable* focus on the benefitted class." *Id.* at 283–84. To determine whether a particular statute gives rise to a federal right, the Court has enunciated three factors: (1) "Congress must have intended that the provision in question benefit the plaintiff"; (2) "the plaintiff must demonstrate that the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence"; and (3) "the statute must unambiguously impose a binding obligation on the States."[12]

---

[11] *Cf. Yaretsky*, 457 U.S. at 1001 (explaining that a mere possibility that lacks "sufficient immediacy and reality" is insufficient where "[n]othing in the record" shows a concrete threat).

[12] *Blessings v. Freestone*, 520 U.S. 329, 340–41 (1997) (citations omitted). There is a second step to this inquiry. Once the plaintiff establishes "that a statute confers an individual right, the right is presumptively enforceable by § 1983." *Gonzaga*, 536 U.S. at 284.

No. 16-20691

Whether § 1396a(bb) meets these requirements is a question of first impression in this court, although at least five other circuits have found that § 1396a(bb) is enforceable via § 1983.[13]  Moreover, our circuit has held that a similar provision in the Medicaid Act creates rights enforceable under § 1983.[14]  Although these cases are not binding here, they inform our analysis.

A first glance at § 1396a(bb) shows the potential "rights-creating language" that *Gonzaga* calls for.  For instance, look to § 1396a(bb)(5)(A): "[T]he State plan shall provide for payment to the center or clinic by the State of a supplemental payment . . . ."  Similarly, § 1396a(bb)(1) states that "the State plan shall provide for payment for services . . . furnished by a [FQHC] . . . in accordance with the provisions of this subsection."  As other circuits have noted, this language seems to be "rights-creating . . . because it is mandatory and has a clear focus on the benefitted FQHCs."  *E.g.*, *Rio Grande*, 397 F.3d at 74.  But admittedly, this is not as clear as the "rights-creating language" that

Defendants "may rebut this presumption by showing that Congress 'specifically foreclosed a remedy under § 1983,'" such as by providing for "a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Id.* at 284 n.4 (citations omitted). But Texas has offered nothing to rebut this presumption, nor do we find anything in § 1396 to constitute such a comprehensive remedial scheme. Rather, the only case Texas cites, *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1385 (2015), involved an implied right of action—a situation lacking the presumption that § 1983 itself provides the private right of action. Accordingly, our analysis hinges on whether there is a federal right to enforce in § 1396a(bb).

[13] *See Cal. Ass'n of Rural Health Clinics v. Douglas*, 738 F.3d 1007, 1013 (9th Cir. 2013); *N.J. Primary Care Ass'n v. N.J. Dep't of Human Servs.*, 722 F.3d 527, 539 (3d Cir. 2013); *Concilio de Salud Integral de Loiza, Inc. v. Pérez–Perdomo*, 551 F.3d 10, 17–18 (1st Cir. 2008); *Pee Dee Health Care, P.A. v. Sanford*, 509 F.3d 204, 212 (4th Cir. 2007); *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 74 (1st Cir. 2005). Furthermore, other circuits have permitted suits to enforce § 1396a(bb) under § 1983 but did not discuss the issue. *See also, e.g.*, *Cmty. Health Care Ass'n of N.Y. v. Shah*, 770 F.3d 129, 157 (2d Cir. 2014).

[14] *See Romano v. Greenstein*, 721 F.3d 373, 377–79 (5th Cir. 2013) (finding 42 U.S.C. § 1396a(a)(8) enforceable under § 1983). Section 1396a(a)(8) requires state plans to "provide that all individuals wishing to make application for medical assistance under the plan shall have [the] opportunity to do so, and that such assistance shall be furnished with reasonable promptness."

17

No. 16-20691

*Gonzaga* specifically referenced.[15]  Hence we turn to the *Blessings* factors.

The three *Blessings* factors show that § 1396a(bb) provides enforceable rights.  First, by requiring states to ensure that FQHCs are fully paid, the subsection indicates that FQHCs are its intended beneficiaries.  *See Rio Grande*, 397 F.3d at 74.  Second, the subsection provides for judicially administrable standards.  Specific requirements that states reimburse FQHCs for certain services, at definite amounts, are far from overly vague or amorphous.  *See Pee Dee Health Care*, 509 F.3d at 212.  Third, the statute imposes "a binding obligation on the States."  *Blessings*, 520 U.S. at 341.  The language "the State plan shall provide" is precisely the same language that this court has said is binding.[16]  Thus, the *Blessings* factors establish that § 1396a(bb) confers a private right enforceable through § 1983.[17]

Texas offers two counterarguments, but they are unavailing.  First, the state posits that we should consider the plurality opinion in *Armstrong*, 135 S. Ct. at 1387 (Scalia J., plurality opinion).  Specifically, Texas points to the plurality's statement that the Medicaid Act may have been intended to benefit the infirm rather than health care providers such as FQHCs.  But in the first

---

[15] For example, *Gonzaga*, 536 U.S. at 287, referenced Titles VI and IX, which state that "[n]o person . . . shall . . . be subjected to discrimination."  Although  that language may be the paradigm of "rights-creating," the paradigm of non-rights-creating language would be the statute at issue in *Gonzaga*: "'[N]o funds shall be made available' to any 'educational agency or institution' which has a prohibited 'policy or practice.'"  *Id*. (citing FERPA, 20 U.S.C. § 1232g(b)(1)).  The language at issue here is somewhere in between Title IX and FERPA.

[16] *See S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 603 (5th Cir. 2004) (holding that 42 U.S.C. § 1396a(a)(10)(A)(i) was enforceable under § 1983 in part because of the language "[a] State Plan must provide").

[17] Texas notes that the district court only analyzed § 1396a(bb)(5) and that the other provisions only set forth a payment methodology.  Fair enough; this suit involves § 1396a-(bb)(1) as well.  But our analysis applies equally to § 1396a(bb)(1): "[T]he State shall provide for payment for services . . . furnished by a [FQHC] . . . in accordance with the provisions of this subsection."

18

No. 16-20691

place, this language is distinguishable. As stated above, § 1396a(bb) issues a command to benefit FQHCs by ensuring that they are fully reimbursed. Conversely, the provision at issue in *Armstrong* had no such focus on beneficiaries, as that provision dealt with procedures to make efficient payments. *See Armstrong*, 135 S. Ct. at 1382, 1385.[18] In the second place, the plurality's statement, if taken to the conclusion urged by Texas, would likely overrule cases such as *Wilder v. Virginia Hospital Association*, 496 U.S. 498, 512 (1990), in which the Court found other provisions of the Medicaid Act to be enforceable by health care providers through § 1983—thus Texas's contention goes too far.

Second, Texas contends that § 1396a(bb) could only confer the right to be paid at its full PPS rate, as distinguished from the right to be paid in a particular way. Yet Texas again conflates Legacy's winning on the merits with its having a cause of action. Texas may be correct that § 1396a(bb) does not give Legacy a right to be paid in full by the state rather than by MCOs. But Legacy can have a right to sue under § 1983 and still lose on the merits.[19] Accordingly, Legacy has a private right of action, under § 1983, to enforce § 1396a(bb).

## IV.

Given that Legacy has standing to bring two of its claims and has a cause of action under § 1983, we turn to the merits of those claims. We conclude that

---

[18] In *Armstrong*, 135 S. Ct. at 1382, the Court considered 42 U.S.C. § 1369a(a)(30)(A), which requires state plans to "provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . . as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area."

[19] *See, e.g.*, *Cal. Ass'n of Rural Health Clinics v. Douglas*, 738 F.3d 1007, 1011–17 (9th Cir. 2013) (taking this approach); *Three Lower Ctys. Cmty. Health Servs., Inc. v. Maryland*, 498 F.3d 294, 305 (4th Cir. 2007) (rejecting a challenge under § 1396a(bb)(5) for improper delegations to MCOs instead of dismissing for want of a cause of action).

No. 16-20691

summary judgment should have been granted to Texas, not Legacy.

A.

Regarding Legacy's "in-network" claim that the Commission may not require MCOs fully to reimburse FQHCs in the first instance, the district court reasoned that the text and purposes behind § 1396a(bb)(5) require imposing an implied limit on Texas's disbursement of Medicaid funds.[20] We disagree.

For "all issues of statutory interpretation, the appropriate place to begin . . . is with the text itself." *Hamilton v. United Healthcare of La., Inc.*, 310 F.3d 385, 391 (5th Cir. 2002) (citation omitted). The main provision, § 1396a-(bb)(5)(A), says that "the State plan shall provide for payment to the center or clinic by the State of a supplemental payment equal to the amount (if any) by which the amount determined under . . . this subsection exceeds the amount of the payments provided under the contract." The plain meaning is that the state must provide for supplemental payments only if there is a shortfall between the PPS rate and the MCO reimbursement rate. Nothing in this sub-section prohibits states from requiring MCOs to pay the full PPS rate, thereby obviating the need for supplemental payments in the first place.

This reading is buttressed by the inclusion of "if any," which

---

[20] The district court accorded *Chevron* deference to CMS's approval of SPA 16-02. On appeal, Texas maintains that the approval should receive *Chevron* deference, reading the approval as buttressing the idea that Texas's plan is permissible (and, although Legacy lacks standing to challenge SPA 16-02 as such, that approval could still be relevant inasmuch as SPA 16-02 codified Texas's practice of requiring MCOs fully to reimburse FQHCs). To the contrary, CMS's approval of SPA 16-02 has no bearing on this case.

As CMS explained in its statement of interest to the district court, it did so only as an APM under § 1396a(bb)(6)—not under § 1396a(bb)(5). Given that the initial approval did not specify under which subsection CMS approved SPA 16-02, we see no reason not to credit this explanation of the approval. *Cf. Auer v. Robbins*, 519 U.S. 452, 460–63 (1997). Accordingly, the approval has no bearing on whether Texas's policy is permissible under § 1396a(bb)(5). Because, as explained below, we do not reach the question of whether Texas's policy would be a valid APM, we have nothing about which to give *Chevron* deference to CMS.

demonstrates that there may not be a shortfall between the PPS rate and MCO reimbursements.  Legacy responds that the words "if any" have meaning only in the event that an MCO *in its discretion* just happens to contract with an FQHC to reimburse it at the full PPS rate.  But nothing in the text supports such a conclusion.  The statute merely says there must be supplemental payments if there is "any" shortfall—nothing prevents the state from attempting to eliminate such shortfalls or requires the amount of the shortfall to be determined entirely by the MCO.

The district court also examined the reference to "the contract" at the end of § 1396a(bb)(5)(A)—*i.e.*, the statement that the shortfall amount is determined by the PPS amount less the amount provided under "the contract."  The court reasoned that "the contract" must refer to the MCO-FQHC contract.  We agree.  Section 1396a(bb)(5)(A) would make little sense otherwise.

But the district court then erred in deducing that this reference to the MCO-FQHC contract compels reading § 1396a(bb)(5)(A) to require unfettered discretion in MCO-FQHC contracts.  The reference says nothing about whether the state may impose conditions on the MCO-FQHC contract.  Instead, the subsection merely points to what the terms of the contract are, without regard to how those terms came into being.  Thus, it is fully consistent with § 1396a-(bb)(5)(A) for the state to require the contract to reimburse the FQHCs fully.  In that situation, there just would not be "any" supplemental payment to be made, because the PPS rate would not exceed the amount "provided under the [MCO-FQHC] contract."  42 U.S.C. § 1396a(bb)(5)(A).

Without any aid from the text of § 1396a(bb)(5), Legacy turns to § 1396b-(m)(2)(A)(ix).  Section 1396b(m)(2)(A) imposes certain obligations on the states that must be established in the state-MCO contracts.  As relevant here, § 1396b(m)(2)(A)(ix) requires that all state-MCO contracts "provide[], in the

No. 16-20691

case of an [FQHC-MCO contract] . . . that the [MCO] shall provide payment that is not less than the level and amount of payment which the [MCO] would make for the services if the services were furnished by a provider which is not [an FQHC]." Essentially, MCOs must contract with FQHCs at a rate "not less than" the going market rate for services.

The plain meaning of this text only sets a floor—the market rate—for MCO-FQHC contracts. Legacy contends, however, that the statute also prohibits states from imposing any other floors on MCO-FQHC contracts. That is, Legacy declares that § 1396b(m)(2)(A)(ix)'s floor is the only floor allowed and sets an implied ceiling for what is required of MCO-FQHC contracts.[21]

We are loath to read such implied limits into statutes. "We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what is says there." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 461–62 (2002).[22] If the statute is unambiguous, then the "judicial inquiry is complete." *Id.* at 462. Our reading of the text reflects no ambiguity, and Legacy offers nothing to the contrary.

---

[21] The only other court squarely to address this issue found that § 1396b(m)(2)(A)(ix) did not impose any ceiling on what states may require in an MCO-FQHC contract. *See Three Lower Ctys.*, 498 F.3d at 304–305. Although the district court relied on cases from other circuits, those decisions are not on point insofar as they merely state that MCOs have to reimburse FQHCs at a minimum market rate and that states have to make supplemental wraparound payments if needed. *See, e.g.*, *N.J. Primary Care*, 722 F.3d at 539–40; *Cmty. Health Care*, 770 F.3d at 153–58; *Rio Grande*, 397 F.3d at 75–76.

[22] It is for this reason that we do not adhere to CMS's position, articulated in its guidance letters (such as its 1998 SMDL letter), that states are not permitted to impose any requirements on MCO-FQHC contracts other than those in § 1396b(m)(2)(A)(ix). Though CMS undoubtedly has carefully considered this position, its letter is not entitled to *Chevron* deference insofar as it was not "promulgated in the exercise" of CMS's law-making powers. *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001); *see also Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000) (finding that "an interpretation contained in an opinion letter" does not warrant *Chevron* deference). Accordingly, we look to the agency's views in this regard only "for guidance" or persuasion. *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944); *see also Greathouse v. JHS Sec. Inc.*, 784 F.3d 105, 114 (2d Cir. 2015).

No. 16-20691

The provisions, in combination, provide that MCOs must contract with FQHCs at a rate "not less than" the market rate.[23] If, and only if, the MCO-FQHC contract is less than the PPS rate, then the state must make supplemental wraparound payments. Because the plain text of §§ 1396b(m)(2)(A)(ix) and 1396a(bb)(5) is unambiguous and does not forbid states from requiring MCOs to reimburse FQHCs fully, we will not read such a prohibition into what Congress wrote.[24] Therefore, Texas may require MCOs to reimburse FQHCs fully in the first instance.[25]

B.

Legacy claims that the Commission violated § 1396a(bb)(1)–(2) by failing to reimburse it for services that it has been providing to TCHP's Medicaid enrollees. As explained above, Legacy has continued to provide all of the Medicaid services to TCHP's Medicaid patients even after the contract was

[23] Instead of pointing to any statutory ambiguity, Legacy makes bare policy arguments about § 1396a(bb)(5). But it is not our job to decide what policies Congress *should* have enacted. *Sigmon Coal Co.*, 534 U.S. at 462. Even addressing Legacy's policy arguments, it is far from certain that the parade of horribles it posits will ever come to pass. Although Legacy insists that MCOs will never contract with FQHCs under Texas's policy, the record shows that TCHP still has contracts with approximately seventeen FQHCs. And although Legacy is correct that the Medicaid Act itself, before to 1997, required MCOs to reimburse FQHCs fully, that does not mean that states are now barred from requiring MCOs to reimburse FQHCs fully. Given that Congress did not impose such a prohibition on the states, we cannot infer one where Congress may well have wanted to leave that decision up to each respective state. *Cf. Three Lower Ctys.*, 498 F.3d at 305.

[24] At oral argument, Legacy suggested that even if the Medicaid Act does not prohibit Texas from requiring MCOs fully to reimburse FQHCs, Texas somehow consented to CMS's 1998 SMDLs in a way that bound itself to CMS's position articulated above. Yet we see no authority for the idea that a state may somehow legally bind itself to an agency's guidance documents. Indeed, the notion that a state might consent to an agency's interpretation and thereafter be forever bound to it is wholly inconsistent with the fact that agencies are permitted to change their own interpretation of statutes. *See Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981–82 (2005).

[25] Because the Medicaid Act does not bar Texas from requiring MCOs fully to reimburse FQHCs in the first place, we need not address Texas's alternative argument that its MCO reimbursement requirement is permissible as an APM under § 1396a(bb)(6).

terminated. The Commission requires MCOs to reimburse FQHCs for emergency "out-of-network" services such as these but not for non-emergency out-of-network services unless the FQHC received prior authorization for the service. Because Legacy did not receive prior authorization for many of these non-emergency services, its claims were denied by TCHP and the Commission. Legacy insists that the Commission is required by § 1396a(bb) to reimburse it for non-emergency out-of-network services.[26] The district court agreed with Legacy.[27] We reverse.

The starting point is the plain text of § 1396a(bb)(1), which requires states to "provide for payment for services described in section 1396d(a)(2)(C) of this title furnished by a [FQHC] . . . in accordance with the provisions of this subsection," *i.e.*, the PPS rate. In turn, § 1396d(a)(2)(C) refers to "care and services . . . for individuals [within an enumerated list] . . . whose income and resources are insufficient to meet all of such cost . . . [of FQHC] services." Yet § 1396d(a)(2)(C) does not explain what the relevant FQHC services are.

Texas points to § 1396b(m)(2)(A), which provides definitions and requirements for MCOs. Specifically, § 1396b(m)(2)(A)(vii) requires state-MCO contracts to specify whether the state or MCO will reimburse healthcare providers for emergency out-of-network services. Thus, Texas reasons, § 1396b(m)-(2)(A)(vii) specifies which out-of-network services the state is responsible for.

---

[26] In the district court, Legacy claimed that the Commission also was failing to reimburse it for certain emergency out-of-network services. The court rejected that contention, and Legacy does not raise it on appeal.

[27] The district court again cited *New Jersey Primary Care*, 722 F.3d at 539–40, and *Community Health Care*, 770 F.3d at 153–158, to support its decision. Those cases are inapposite; although they held that states are required to reimburse FQHCs for all covered services, those courts did not have occasion to decide what "covered" services are. Instead, they turned on the fact that the defendant-states had made reimbursements contingent on prior MCO payment. *See N.J. Primary Care*, 722 F.3d at 540; *Cmty. Health Care*, 770 F.3d at 156–57. Thus, the courts were concerned with FQHCs' performing covered services and not being reimbursed by the state merely because the MCO denied payment.

No. 16-20691

We agree. If states had to reimburse FQHCs for *all* out-of-network services to Medicaid enrollees, then FQHCs would have little or no incentive to contract with MCOs. Indeed, this case is exemplary—if the district court were affirmed, Legacy would have lost its contract with TCHP with almost no penalty, continuing to provide services to TCHP's enrollees while receiving full reimbursement from the state.

It follows that using § 1396b(m)(2)(A)(vii) as the limit for what out-of-network services the FQHC may provide makes paramount sense. The statute requires reimbursement only for emergency services, for which patients need to find the nearest clinic and get quick care, without concern for whether the clinic is in or out of their network. For non-emergency services, though, FQHCs should have to contract with those MCOs to provide services when the state uses MCOs to manage its Medicaid services. And finally, the entire structure of the Medicaid Act contemplates states' using MCOs as intermediaries and MCO-FQHC contracts.[28] It would be wholly inconsistent with that structure to eliminate the distinction between in-network and out-of-network care for FQHCs, thereby effectively removing MCOs from the equation and obviating the need for MCO-FQHC contracts. Congress did not order that absurd result.[29]

The closest Legacy comes to an opposing consideration is its claim that,

---

[28] *See, e.g.*, §§ 1396a(a)(23), 1396a(bb), 1396b(k), 1396b(m), 1396u-2(a)(1); *see generally Yates v. United States*, 135 S. Ct. 1074 (2015) (using context to ascertain the meaning of a statutory provision).

[29] CMS's statement of interest fully accords with our reading. Although Legacy purports to rely on CMS's statement that FQHCs must be paid "the full PPS amount for any covered out-of-network services," context indicates that statement is consistent with our conclusion. The critical question is what "covered" serves are. And while citing § 1396b-(m)(2)(A)(vii), CMS expressly framed the requirement as "out-of-network health centers [must] be reimbursed for 'medically necessary services which were provided . . . because the services were immediately required due to unforeseen illness, injury, or condition," *i.e.*, emergency services.

as an FQHC, it is required to assure that patients are treated despite inability to pay. *See* 42 U.S.C. § 254b(k)(3)(G)(iii). But that requirement is part of the responsibilities that attach to Section 330 grants. As Legacy acknowledges, one of the main points of the relevant Medicaid Act provisions is to ensure that Section 330 funds are not used to subsidize Medicaid services. *See Cmty. Health Care*, 770 F.3d at 150; *Three Lower Ctys.*, 498 F.3d at 297–98. It thus makes little sense to create a situation in which Medicaid funds would be used to fulfill a Section 330 obligation. Accordingly, Texas is not required to reimburse Legacy for the non-emergency out-of-network services about which it complains.

For the reasons explained, the judgment is REVERSED and REMANDED with instruction that Legacy's claim as to SPA 16-02's lack of a requirement to make supplemental "wraparound" payments be DISMISSED for want of standing and that judgment be entered for the Commission as to the remaining claims.

No. 16-20691

EDITH H. JONES, Circuit Judge, dissenting in part:

With respect, I would dismiss Legacy's complaint regarding the Commission's rule that MCOs must fully reimburse FQHCs because Legacy has failed to establish standing to raise this issue. "The party invoking federal jurisdiction bears the burden" of establishing standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561, 112 S. Ct. 2130, 2136 (1992). At the summary judgment stage, the party invoking federal jurisdiction "can no longer rest on . . . 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts.'" *Id.* at 561, 112 S. Ct. at 2137. Legacy has failed to present any evidence, or even argued, that it has been injured because it "undoubtedly will have future dealings with MCOs." And *Clinton* cannot save Legacy from its failure to do so. *Clinton v. City of N.Y.*, 524 U.S. 417, 118 S. Ct. 2091 (1998). In *Clinton*, the farmer's cooperative plaintiff presented evidence that it was "actively searching for other processing facilities for possible future purchase if the President's cancellation [were] reversed; and there [were] ample processing facilities in the State that [the cooperative might have been] able to purchase." *Clinton*, 524 U.S. at 432, 118 S. Ct. at 2100.[1]

Here, in contrast, Legacy has contended from the outset that it has standing simply because of its terminated contract with TCHP. Legacy improperly relied on *Planned Parenthood v. Gee*, a case that was altered on rehearing due to Supreme Court case law.[2] Legacy admits it was never denied a dime of reimbursement under its contract with TCHP. Regardless whether

---

[1] The majority relies on the "bargaining chip" language in *Clinton*, which has never been referenced in the Supreme Court in nearly twenty years since it was decided.

[2] *Compare Planned Parenthood of the Gulf Coast, Inc. v. Gee*, 837 F.3d 477, 487 & n.14 (5th Cir. 2016), *with Planned Parenthood of the Gulf Coast, Inc. v. Gee*, 862 F.3d 445, 455 & n.14 (5th Cir. 2017) (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016)).

27

No. 16-20691

I agree with the opinion's resolution of the merits, we do not have jurisdiction to decide this claim because Legacy does not have standing to pursue this claim. I respectfully dissent from this piece of an otherwise excellent opinion.