# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

THREE LOWER COUNTIES COMMUNITY
HEALTH SERVICES, INCORPORATED,
*Plaintiff-Appellant,*

v.

THE STATE OF MARYLAND,
DEPARTMENT OF HEALTH AND MENTAL
HYGIENE; ANTHONY MCCANN,
Secretary, State of Maryland
Department of Health and Mental
Hygiene,

*Defendants-Appellees.*

No. 06-1552

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Andre M. Davis, District Judge.
(1:05-cv-01280-AMD)

Argued: May 22, 2007

Decided: August 24, 2007

Before NIEMEYER and MICHAEL, Circuit Judges, and
WILKINS, Senior Circuit Judge.

Affirmed in part, reversed in part, and remanded with instructions by
published opinion. Judge Niemeyer wrote the opinion, in which Judge
Michael and Senior Judge Wilkins joined.

## COUNSEL

**ARGUED:** James Leo Feldesman, FELDESMAN, TUCKER,
LEIFER & FIDELL, L.L.P., Washington, D.C., for Appellant. Jason

W. Sapsin, Assistant Attorney General, OFFICE OF THE ATTOR-NEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees. **ON BRIEF:** Kathy S. Ghiladi, FELDESMAN, TUCKER, LEIFER & FIDELL, L.L.P., Washington, D.C., for Appellant. J. Joseph Curran, Jr., Attorney General of Maryland, Lorie A. Mayorga, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees.

---

**OPINION**

NIEMEYER, Circuit Judge:

In this appeal, we clarify a State's obligations under the federal Medicaid program when paying "Federally-qualified health centers" for services they render to Medicaid patients. *See* 42 U.S.C. § 1396a(bb)(5).

Three Lower Counties Community Health Services, Inc., a health center serving poor residents on the lower Eastern Shore of Maryland, commenced this action against the State of Maryland's Department of Health and Mental Hygiene (hereinafter "Maryland" or "Department of Health"), the state agency that administers the Medicaid program in Maryland, to obtain a declaratory judgment that Maryland violates the Medicaid Act in four respects: (1) Maryland does not make fully compensatory supplemental payments at least as frequently as every four months to Three Lower Counties, a "Federally-qualified health center," for healthcare services provided to Medicaid patients; (2) Maryland fails to compensate Three Lower Counties for emergency healthcare services provided to Medicaid patients who are enrolled with managed care organizations with which Three Lower Counties does not have a contract; (3) Maryland establishes a rate that managed care organizations must pay that is disadvantageous to Federally-qualified health centers in providing services to Medicaid patients; and (4) Maryland delegates to managed care organizations the determination of whether supplemental payments are required to be paid to Federally-qualified health centers. Three Lower Counties also seeks injunctive relief to require the Department of Health to comply with the Medicaid Act in these respects.

The district court granted Maryland's motion for summary judgment on all four issues. For the reasons that follow, we reverse with respect to the first two issues and affirm with respect to the last two, and we remand this case to the district court to grant Three Lower Counties appropriate relief.

I

Three Lower Counties Community Health Services, Inc., located in Princess Anne, Maryland, has provided healthcare services since 1994 to the poor residents of Somerset and Wicomico Counties, operating a community "health center" under the Public Health Service Act, 42 U.S.C. § 254b. Three Lower Counties receives federal grant funds under § 330 of that Act. To qualify for those funds, health centers must be located in a medically underserved area or serve a "specially medically underserved population comprised of migratory and seasonal agricultural workers, the homeless, and residents of public housing." 42 U.S.C. § 254b(a)(1). In addition, the Public Health Service Act requires that such health centers deny no patient healthcare services due to the patient's inability to pay, *see id.* § 254b(k)(3)(G)(iii)(I), and, more pertinent to this litigation, that they provide healthcare services to Medicaid enrollees, *see id.* § 254b(k)(3)(E).

The federal Medicaid program provides federal financial assistance to States that choose to participate in the program and requires the States to reimburse healthcare providers who provide services to Medicaid enrollees. The purpose of the Medicaid program is to enable States "to furnish . . . medical assistance on behalf of families with dependent children . . . whose income and resources are insufficient to meet the costs of necessary medical services." 42 U.S.C. § 1396. States need not participate in the program, but if they choose to do so, "they must implement and operate Medicaid programs that comply with detailed federally mandated standards." *Antricam v. Odom*, 290 F.3d 178, 183 n.2 (4th Cir. 2002).

One federal requirement is that a state Medicaid plan provide payment for services rendered by "Federally-qualified health centers" ("FQHCs"). *See* 42 U.S.C. § 1396a(a)(15); *id.* § 1396d(a)(2)(C); *id.* § 1396d(l)(2). FQHCs are defined as health centers that receive, or

meet the requirements for receiving, grants under § 330 of the Public Health Service Act. *Id.* § 1396d(l)(2). Three Lower Counties is therefore not only a "health center" receiving funds under the Public Health Service Act but also, by definition, an FQHC receiving funds under the federal Medicaid program.

From 1989 through 2000, the federal Medicaid program required States to reimburse FQHCs for "100 percent . . . of [each FQHC's] costs which are reasonable." 42 U.S.C. § 1396a(a)(13)(C) (repealed 2000). Congress' purpose in passing this "100 percent reimbursement" requirement was to ensure that health centers receiving funds under § 330 of the Public Health Services Act would not have to divert Public Health Services Act funds to cover the cost of serving Medicaid patients. The report of the House Budget Committee accompanying the 1989 legislation describes this payment guarantee specifically as follows:

> Medicaid payment levels to Federally-funded health centers cover less than 70 percent of the costs incurred by the centers in serving Medicaid patients. The role of [these health centers] . . . is to deliver comprehensive primary care services to underserved populations or areas without regard to ability to pay. To the extent that the Medicaid program is not covering the cost of treating its own beneficiaries, it is compromising the ability of the centers to meet the primary care needs of those without any public or private coverage whatsoever.

> * * *

> To ensure that Federal [Public Health Service] Act grant funds are not used to subsidize health center or program services to Medicaid beneficiaries, States would be required to make payment for these [FQHC] services at 100 percent of the costs which are reasonable and related to the cost of furnishing those services.

H.R. Rep. No. 101-247, *reprinted in* 1989 U.S.C.C.A.N. 1906, 2118-19.

To relieve health centers from having to supply new cost data every year, Congress amended the Medicaid Act in 2000 to implement a new *prospective* payment system based on average historical costs plus a cost-of-living factor. The new prospective payment system, which began with fiscal year 2001, required state Medicaid plans to "provide for payment for such services [provided by an FQHC] in an amount (calculated on a per visit basis) that is equal to 100 percent of the average of the costs of the center or clinic of furnishing such services during fiscal years 1999 and 2000 which are reasonable." 42 U.S.C. § 1396a(bb)(2). That is, under the new system, each health center's reasonable costs for providing Medicaid services for the years 1999 and 2000 were added together, and the sum was divided by the total number of visits by Medicaid patients in those two years to obtain an average per-visit cost rate. This average per-visit cost rate for the years 1999 and 2000 became the baseline per-visit rate to be applied in all future years, adjusted by a cost-of-living index (the Medicare Economic Index) and any change in the scope of services. *See* 42 U.S.C. § 1396a(bb)(2)-(3).

Thus, to calculate a health center's Medicaid payment for each fiscal year beginning 2001 and thereafter, the average per-visit cost rate calculated for 1999 and 2000 is multiplied by the number of visits made by Medicaid patients in the applicable fiscal year (2001 or later), adjusted by the cost-of-living index and for any change in the scope of services. While a health center's costs for servicing Medicaid enrollees is no longer audited every year, health centers must submit new visit data for each new year.

The Maryland Department of Health has the responsibility of performing these calculations for each FQHC in Maryland — i.e., determining the center's average cost per Medicaid visit in 1999 and 2000, applying the inflation factor, adjusting for any change in the scope of services, and multiplying that figure by the number of Medicaid patient visits to the FQHC in the relevant period. Maryland also has the responsibility of ensuring that the health center receive *full* payment for each Medicaid visit, as required by the Medicaid Act.

There is an added twist in how FQHCs are compensated when a State, such as Maryland, operates a managed care program for providing Medicaid services. HealthChoice, Maryland's Medicaid managed

care program, contracts on behalf of Maryland with managed care organizations (more commonly known as health maintenance organizations or HMOs) to arrange for the delivery of healthcare services to its Medicaid enrollees. Unless the managed care organization owns a hospital or clinic, it in turn contracts with healthcare providers, including FQHCs, to deliver the medical services to the Medicaid patients. *See generally* Md. Code Regs. (hereinafter "COMAR") 10.09.62-10.09.73.

When States, such as Maryland, operate the Medicaid program through managed care organizations, the contract between the managed care organization and the FQHC usually compensates the FQHC at an amount below that required by the Medicaid Act. But Congress addressed this problem by requiring the States to pay FQHCs a supplemental or "wrap-around" payment for the difference between what the managed care organization paid the FQHC and what the FQHC is entitled to be paid under the Medicaid Act:

> In the case of services furnished by a Federally-qualified health center . . . pursuant to a contract between the center and a managed care entity, . . . the State plan shall provide for payment to the center or clinic by the State of a supplemental payment equal to the amount (if any) by which the [statutorily required per-visit rate] exceeds the amount of the payments provided under the contract.

42 U.S.C. § 1396a(bb)(5)(A). These supplemental payments "shall be made . . . in no case less frequently than every 4 months." *Id.* § 1396a(bb)(5)(B). Thus, even when a State relies upon a managed care system to administer its Medicaid program, FQHCs are protected and must receive the full per-visit rate calculated pursuant to the methodology outlined in the Medicaid Act.

In short, under this scheme, an FQHC, such as Three Lower Counties, receives a part of its Medicaid payment from the managed care organization and the balance from Maryland in the form of a supplemental or "wrap-around" payment.

Under the practice Maryland has adopted, the Department of Health makes a portion of the supplemental payment in advance,

labeling the prospective payment as an "interim supplemental payment," and the remaining portion retrospectively, labeling the balance as a payment in "reconciliation" of the account. It makes the prospective payment every three months, at the beginning of each calendar quarter. Because no services have yet been billed for the quarter, the interim supplemental payment is based on the health center's historical data for the same quarter in the preceding year. *See generally* COMAR 10.09.08.05-1. According to Three Lower Counties, the interim supplemental payment "invariably" fails to close the gap between the managed care organization's payments and the per-visit amount to which FQHCs are entitled under the Medicaid Act. According to Three Lower Counties, the shortfall is "substantial." For the most recent quarter on which it presented data to the district court, the shortfall was on the order of $500,000. The Department of Health reconciles the shortfall (or excess) with the FQHC between six and nine months after the end of the quarter for which the interim supplemental payment was made.

Under its procedures, Maryland requires FQHCs to file their claims for services rendered to Medicaid patients with the patient's managed care organization. *See* COMAR 10.09.36.06A. It gives FQHCs up to nine months to submit those claims. *Id.* After the FQHC has submitted a claim to a managed care organization, the managed care organization validates and processes the claim and then transmits the claim information to Maryland's Department of Health. The Department of Health totals the number of visits to any particular FQHC over a six-month period and determines whether the interim supplemental payment closed the gap between what the managed care organization paid and what the statutory per-visit rate requires. As may be necessary, the Department of Health makes a "reconciliation" payment or applies a charge when there has been an overpayment. This is accomplished within 12 months of the end of the 6-month accounting period. *See generally* COMAR 10.09.08.05-1. Maryland claims that it waits this long in order to accommodate the nine-month period it gives healthcare providers to file claims and to give the managed care organizations time to validate, process, and transmit the claims to the Department of Health.

Three Lower Counties claims that Maryland's practices in paying for services provided to Medicaid patients results in a substantial and

accumulating debt owed by Maryland to reconcile its account with Three Lower Counties. Three Lower Counties states that "by December 2003, for in-network medical and dental services, [it] had a cash receivable of $1,032,176. The amount grew to $1,461,930 by the end of December 2004. By the end of December 2005, the amount was $1,734,511." According to Three Lower Counties, the cash receivables from the State have amounted to about 13% of its annual revenue and is denying Three Lower Counties much needed cash, "preventing the health center from adding approximately six physicians."

Three Lower Counties commenced this action against the Department of Health seeking a declaratory judgment that the Department of Health is violating the Medicaid Act and injunctive relief to require the Department of Health to comply with the Act. Three Lower Counties contends specifically that Maryland is not complying with the Medicaid Act in four respects: (1) to reimburse Three Lower Counties, it uses an interim payment system with subsequent reconciliation, creating deficiencies that extend beyond four months, in violation of 42 U.S.C. § 1396a(bb)(5); (2) it refuses to reimburse Three Lower Counties for "out-of-network" services provided to Medicaid enrollees in need of emergency care; (3) it requires managed care organizations to pay Three Lower Counties a higher rate than that charged to non-FQHCs, thereby deterring managed care organizations from contracting with Three Lower Counties; and (4) it requires Three Lower Counties to submit claims for payment to the patients' managed care organization rather than to the Department of Health directly. On cross-motions for summary judgment, the district court entered judgment in favor of the Department of Health on all four issues. This appeal followed.

II

For its principal argument on appeal, Three Lower Counties contends that Maryland fails to comply with § 1396a(bb)(5) of the Medicaid Act by not making *fully compensatory* supplemental payments at least every four months. It argues that Maryland's interim payments result in inaccurate approximations of what is owed to Three Lower Counties, creating deficiencies that extend far beyond four months.

Maryland agrees that § 1396a(bb)(5) requires that supplemental payments be made at least every four months, but Maryland notes that the Medicaid Act "does *not* specify the maximum amount of time between the supplemental payment and the service to which it relates." It argues that it meets the frequency requirement by making interim supplemental payments and that it is free to reconcile any deficiency at a later time because the frequency of payments required by § 1396a(bb)(5) is not tied to the date when the services were provided to the Medicaid patient. Maryland thus contends that because it makes a payment every four months, it meets its obligations.

The district court, in ruling in favor of Maryland, did not address the text of § 1396a(bb)(5). Rather, the court reasoned that it would be too administratively burdensome for the Department of Health to make a fully compensatory supplemental payment to FQHCs at least once every four months. The court explained, "In view of the current realities of Medicaid administration, it would seem impossible for [the Department of Health] to supply payment in the manner [Three Lower Counties] insists is required by statute." In essence, the district court recognized a burdensomeness defense to the requirements imposed by § 1396a(bb)(5).

We begin with the text, for the Supreme Court has "stated time and again," notwithstanding the administrative complexities of implementing a federal program, "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Connecticut National Bank v. Germain*, 503 U.S. 249, 253-54 (1992). "When the statutory language is plain, the sole function of the courts — at least where the disposition required by the text is not absurd — is to enforce it according to its terms." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 126 S. Ct. 2455, 2459 (2006) (internal quotation marks omitted).

Section 1396a(bb)(5)(d) provides that a State must make a "supplemental payment [to the FQHC] *equal to* the amount (if any) by which the [per-visit rate] exceeds the amount of the payments provided under the [managed care] contract." (Emphasis added). Moreover, States must make these fully compensatory payments "in no case less frequently than every four months." 42 U.S.C. § 1396a(bb)(5)(B). The operative language of the statute for this case are the words

"equal to." The supplemental payment must be "equal to" the difference between the payment made by the managed care organization and the per-visit rate fixed by the Medicaid Act. Thus, the statute plainly provides that a State must make *fully compensatory* supplemental payments no less frequently than every four months.

Maryland's method for compensating FQHCs, and Three Lower Counties in particular, is inconsistent with these requirements. Maryland's *interim* supplemental payments are not *fully* compensatory, but only approximations of full supplemental payments, and Maryland acknowledges that its interim supplemental payments are usually insufficient, requiring later reconciliation payments. Indeed, Three Lower Counties argues that Maryland's interim supplemental payments are "invariably" deficient by a substantial amount and that its accounts receivable from the State have increased over the years so that they now approach $2 million, virtually 13% of its total income. Maryland's practice does not accomplish full payment of the supplemental amount until a reconciliation occurs, which is six to nine months after the end of the applicable quarter for which the interim payment had been made. Because the interim supplemental payment is not fully compensatory, it is not a payment that is "equal to" the difference between the amount paid by the managed care organization and the statutory per-visit rate. Even though the partial interim payment is made with the frequency required by the statute, it does not fulfill the statutory requirement of full compensation because the reconciliation payment comes a full six to nine months after the end of the applicable quarter.

Maryland argues that it is impracticable to make fully compensatory supplemental payments within four months because Maryland gives its Medicaid healthcare providers nine months to submit claims to managed care organizations for payment. Thus, it asserts that the Department of Health "cannot determine the supplemental payment during any given . . . four month period. Instead the Department [of Health] must wait until either (1) all claims for payment from the quarter have been filed or (2) the time for filing claims has expired (nine months later)."

This argument fails for several reasons. *First*, the language of the statute does not make any exception for administrative difficulties

that Maryland might have by reason of the practices that it has adopted for administering its Medicaid plan. *Second*, Maryland *does* in fact make *interim* supplemental payments within the four-month period — it just does so in amounts that make them not fully compensatory. *Third*, it is obvious that if the FQHC does not file a claim for payment for nine months, the FQHC cannot expect payment until the Department of Health receives its claim. But once the Department of Health receives the claim, it must make a full supplemental payment within the four-month period provided by the statute.

Maryland also states, responding to Three Lower Counties' argument that payment be made within four months of *when the services were provided to patients*,[1] that the statute contains no language suggesting that the four-month period begins with the actual provision of health services to the patient. Maryland's observation is correct. The statute does not specify the triggering event for commencement of the four-month time period. But logic leads to the conclusion that Maryland cannot be charged with any obligation to make a supplemental payment until the FQHC has submitted a claim for that payment, whether submitted directly to the Department of Health or indirectly through a managed care organization. Under Maryland's regulations, an FQHC must first submit a claim to the patient's managed care organization, who must then promptly transmit the claim information to the Department of Health. But regardless of who submits the claim for supplemental payment — the FQHC or the managed care organization — Maryland cannot be held responsible for making that payment until it receives the claim. From that point, however, it has four months within which to pay the *full* difference between what the man-

---

[1]While Three Lower Counties does argue cryptically and obtusely that "[t]he same SMDL provisions that place DHMH in violation of FQHCs' wraparound payments rights apply with equal force to DHMH's requirement that FQHC visit claims first be approved by the MCOs" and that "CMS' interpretation of the statute via the SMDL is that it is an FQHC visit, not later MCO approval and filing the visit claim with the DHMH, that triggers the State's responsibility to pay the FQHC," we believe the SMDL from CMS regarding MCOs' payment of FQHCs serves little to undermine DHMH's response to TLC's MCO contract contention.

aged care organization paid and the per-visit rate established by the Medicaid Act.[2]

In arguing that it can make an *interim* supplemental payment with a frequency satisfying the four-month requirement and a reconciliation payment a year later, Maryland suggests a scheme that frustrates the very purpose for supplemental payments. In enacting § 1396a(bb)(5), Congress addressed its concern that FQHCs be *fully and promptly* compensated for the services they render to Medicaid enrollees so that the FQHCs could perform their vital function in delivering healthcare to underserved populations in accordance with their § 330 grants under the Public Health Service Act. In order to ensure "that Federal [Public Health Service] Act grant funds are not used to subsidize health center or program services to Medicaid beneficiaries," Congress required States to compensate FQHCs for serving Medicaid enrollees "at 100 percent of the costs which are reasonable." H.R. Rep. No. 101-247, at 393 (1989) *reprinted in* 1989 U.S.C.C.A.N. 1906, 2119. Maryland's delay in making a fully compensatory supplemental payment has undermined this purpose. Three Lower Counties has been required to use § 330 grant funds to subsidize care of its Medicaid patients, denying it the ability, as it claims,

---

[2]Maryland argues that we should afford *Chevron* deference to its interpretation of the Medicaid Act, citing *Perry v. Dowling*, 95 F.3d 231, 237 (2d Cir. 1996) (noting that a state agency's interpretation of a federal statute may receive deference when "the state has received prior federal-agency approval to implement its plan, the federal agency expressly concurs in the state's interpretation of the statute, and the interpretation is a permissible construction of the statute"). We reject this argument for several reasons. *First*, we have repeatedly stated that "[a] state agency's interpretation of federal statutes is not entitled to the deference afforded a federal agency's interpretation of its own statutes under *Chevron*." *GTE South, Inc. v. Morrison*, 199 F.3d 733, 745 (4th Cir. 1999). *Second*, there is no evidence on the record that the Centers for Medicaid and Medicare Services, the relevant federal agency, has adopted Maryland's interpretation of the Medicaid Act as its own. *Third*, even if the federal agency has approved Maryland's interpretation, no argument has been made that such approval constitutes an authoritative interpretation of the Medicaid Act carrying the force of law. *See United States v. Mead*, 533 U.S. 218, 227-28 (2001). *Fourth*, and perhaps most importantly, we conclude that the meaning of the sections of the Medicaid Act at issue here are clear.

to hire six physicians to serve patients in accordance with the Public Health Service Act.

At bottom, we conclude that the Medicaid Act requires Maryland to pay FQHCs *fully compensatory* supplemental payments not less frequently than four months after Maryland has received the claim for supplemental payment, as required by 42 U.S.C. § 1396a(bb)(5), and that Maryland has not been fulfilling this requirement. Accordingly, we reverse the district court's ruling on this issue.

III

Three Lower Counties also contends that the Department of Health violates the Medicaid Act, 42 U.S.C. § 1396b(m)(2)(A)(vii), when it refuses to pay for emergency services that Three Lower Counties provides to Medicaid patients enrolled with a managed care organization with which Three Lower Counties does not have a contract. The Department of Health defends its refusal, asserting simply that Three Lower Counties must bear these costs as part of the cost of doing business in a managed care system.

In entering judgment for the Department of Health, the district court stated, "It is difficult to imagine how either the State or the [managed care organization] could induce compliance with the system of managed care if not by refusing to pay claims when patients have sought, and [FQHCs] have provided, services outside the patient's provider network." The court observed that the "right to refuse payment for 'out-of-network' medical services is a fundamental and necessary part of the system of managed care."

While the district court may have been correct in its observations with respect to managed care in the private sector, it failed to recognize that the federal Medicaid statute requires something different. *See* 42 U.S.C. § 1396b(m)(2)(A)(vii).

Section 1396b(m)(2)(A)(vii) provides that the federal government shall make

> no payment . . . to a State with respect to expenditures incurred by it for payment . . . for services provided by any

>entity . . . which is responsible for the provision [of health services] unless . . . such contract provides that, in the case of medically necessary services which were provided (I) to an individual enrolled with the entity under the contract and entitled to benefits with respect to such services under the States' plan and (II) other than through the organization because the services were immediately required due to an unforeseen illness, injury, or condition, either the [managed care organization] or the State provides for reimbursement with respect to those services.

In plain language, this section requires States to include in their contracts with managed care organizations a provision that requires either the managed care organization or the State to reimburse out-of-network health centers for services provided to the managed care organization's Medicaid enrollees when such services are "immediately required due to an unforeseen illness, injury or condition."

In the area served by Three Lower Counties, there are two managed care organizations, and one of them, UnitedHealth Group, has refused to enter into a contract with Three Lower Counties. Nonetheless, when a Medicaid patient enrolled with UnitedHealth has sought care from Three Lower Counties, Three Lower Counties has served the patient if (1) the patient's doctor or dentist was unavailable, and (2) the patient was in "need of care because of an unforeseen illness, injury or condition for which services are immediately required." In each case when Three Lower Counties has provided such services to out-of-network patients, it has sought payment from UnitedHealth for the services rendered. Sometimes UnitedHealth has compensated Three Lower Counties for the services provided to its Medicaid enrollees (albeit at a rate below Maryland's required "base" or "market" rate as discussed in Part IV, below), and sometimes it has refused to pay at all, citing Three Lower Counties' status as an out-of-network (i.e., outside of UnitedHealth's network) provider. In either case, however, UnitedHealth has not transmitted Three Lower Counties' claim information to the Department of Health for a supplemental payment under 42 U.S.C. § 1396a(bb)(5). Accordingly, when Three Lower Counties has provided emergency services to out-of-network Medicaid patients, it has not received the per-visit payment to which it is entitled under § 1396a(bb)(5). While the Department of Health

does not dispute these facts, it asserts nonetheless that Three Lower Counties must absorb these costs.

In light of the unmistakably clear statutory requirements, however, Maryland's position is unjustifiable. Section 1396b(m)(2)(A)(vii) requires either the State or the managed care organization to compensate a health center for emergency services provided to Medicaid patients, even if the health center is out-of-network. And when the health center is an FQHC, as is Three Lower Counties, § 1396a(bb)(5) requires that the health center's compensation be equal to the statutory per-visit rate. Accordingly, the district court erred in failing to apply the statute as written.

IV

Three Lower Counties next challenges the rate that Maryland requires managed care organizations to pay it. Maryland regulations require managed care organizations to pay in-network FQHCs a base or "market" rate for each patient visit, rather than paying separately for each service provided when a covered patient visits a health center. COMAR 10.09.65.21. (It is this base or "market" rate that is augmented by the Department of Health's interim supplemental payment and, if necessary, by the reconciliation payment that finally brings the FQHC's compensation up to the statutorily required per-visit rate.) Three Lower Counties alleges the minimum rate that Maryland imposes on the managed care organizations is too high and that because the rate is so high, UnitedHealth has refused to enter into a contract with it. Because Maryland's relatively high market rate "disadvantages" Three Lower Counties, it alleges that Maryland violated 42 U.S.C. § 1396b(m)(2)(A)(ix). The district court rejected this argument.

Section 1396b(m)(2)(A)(ix) requires managed care organizations to "provide payment *that is not less than* the level and amount of payment which the [managed care organization] would make for the services if the services were furnished by a provider which is not a Federally-qualified health center." (Emphasis added). Three Lower Counties contends that this section requires a managed care organization to pay FQHCs exactly what it would pay a non-FQHC. But this argument overlooks the language "not *less* than," which imposes a

*floor* on the rates to be paid FQHCs by managed care organizations; it says nothing about a ceiling or precise congruency.

It may be that the market rate paid by managed care organizations to FQHCs is at times higher than the cost of the actual service performed. But this is a function of Maryland's insistence that managed care organizations compensate FQHCs on a per-visit, rather than a per-service, basis. Because of the different bases for establishing the rate, the actual cost of some patient visits will be less than the per-visit "base rate" a managed care organization is required to pay, and at other times it will be more. Three Lower Counties believes that UnitedHealth has refused to enter into a contract because the "market rate is a few dollars per visit more costly than the sums that [United-Health] pays other providers for the same or similar services." While this may be true, § 1396b(m)(2)(A)(ix) does not address Three Lower Counties' concern, and the district court did not err in so concluding.

V

Finally, Three Lower Counties contends that Maryland's requirement that FQHCs submit claims to a Medicaid enrollee's managed care organization, rather than to the Department of Health, violates § 1396a(bb)(5). Because managed care organizations process the claim initially and the State relies on this claim information, Three Lower Counties believes that Maryland has improperly delegated to the managed care organization the determination of whether a supplemental payment is necessary. This contention is meritless.

The Department of Health has not delegated the supplemental payment determination to managed care organizations. Rather, the Department requires managed care organizations to validate and process the claims. *See* Md. Code Ann. Health-Gen. § 15-103(b)(9). Once the managed care organization ensures that (1) a covered service (2) has been furnished (3) to an enrollee (4) by an approved provider, it processes the claim and pays the market rate for the patient visit. It then passes the claim information on to the Department of Health. The Department of Health itself then makes the determination whether a supplemental payment under § 1396a(bb)(5) is necessary. Moreover, even if the Department of Health did delegate to managed care organizations the responsibility of determining whether a supple-

mental payment is necessary, § 1396a(bb)(5) only requires that the state plan provide for the payment of a supplemental payment. It does not require that the state Medicaid agency itself make the determination whether a supplemental payment is necessary.

VI

In sum, we reverse the district court's entry of judgment in favor of the Department of Health on the issues of whether its supplemental payment system satisfies the criteria found in 42 U.S.C. § 1396a(bb)(5) and whether the Department of Health must ensure that Three Lower Counties receives full compensation for emergency services provided to out-of-network Medicaid patients, and we remand with instructions to enter judgment in favor of Three Lower Counties on these two issues, granting it appropriate relief. We affirm the entry of judgment in favor of the Department of Health on the remaining two issues.

*AFFIRMED IN PART, REVERSED IN PART,*
*AND REMANDED WITH INSTRUCTIONS*