Filed 10/7/21 Certified for Partial Pub. 10/29/21 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| FAMILY HEALTH CENTERS OF SAN DIEGO, | C090618 |
| Plaintiff and Appellant, | (Super. Ct. No. 34-2018-80002952-CU-WM-GDS) |
| v. | |
| STATE DEPARTMENT OF HEALTH CARE SERVICES, | |
| Defendant and Respondent. | |

This case concerns the determination of a reasonable reimbursement rate for a federally qualified health center (FQHC) participating in the Medi-Cal program.

As part of a request to receive a higher reimbursement rate, plaintiff Family Health Centers of San Diego (Family Health) submitted a cost report detailing the reimbursable costs incurred by its clinics in providing covered services to Medi-Cal patients. The cost report also identified certain nonallowable costs pertaining to inpatient obstetric (OB) services provided at outside hospitals, subcontracted medical services, and subcontracted homeless services. Because the costs were not allowable Medi-Cal costs, Family Health

1

eliminated them from its cost report.  As part of an audit, however, defendant State Department of Health Care Services (the Department) determined the costs should not have been eliminated from the cost report.  Instead, the Department reclassified the costs to a nonreimbursable cost center, which had the effect of disallowing a proportionate share of the clinics' administrative overhead costs.  Family Health filed an administrative appeal to dispute the audit adjustments, but, after a formal hearing, its appeal was denied.  Family Health then filed a petition for a writ of mandate challenging the administrative decision, which also was denied.

Family Health appeals the trial court's judgment denying its petition.  Family Health contends that the Department did not establish a proper basis for reclassifying the costs to a nonreimbursable cost center, and that the decision to reclassify the costs was not supported by substantial evidence.  Family Health separately argues that a significant subset of the costs should not have been included in the nonreimbursable cost center because they were not costs at all.  We affirm the judgment denying the petition.

BACKGROUND

A.     *Legal background*

The federal Medicaid program is a cooperative federal-state assistance program designed to expand access to medical care for low income persons.  (*Department of Health Services v. Superior Court* (1991) 232 Cal.App.3d 776, 778; 42 U.S.C. § 1396 et seq.)  Through the program, the federal government provides financial assistance to states so that they may reimburse health care providers who furnish necessary medical services to qualified indigent persons.  (*Robert F. Kennedy Medical Center v. Belshé* (1996) 13 Cal.4th 748, 751; *Three Lower Counties Community Health Services, Inc. v. State of Maryland* (4th Cir. 2007) 498 F.3d 294, 297 (*Three Lower Counties*).)  California participates in the Medicaid program through its California Medical Assistance Program, or "Medi-Cal."  (Welf. & Inst. Code, § 14000 et seq.; *Robert F. Kennedy Medical Center, supra*, 13 Cal.4th at p. 751.)  The Department is the state agency responsible for

2

administering California's Medi-Cal program in compliance with the state Medicaid plan and applicable federal and state Medicaid laws and regulations. (*Redding Medical Center v. Bontá* (1999) 75 Cal.App.4th 478, 480 (*Redding*); Welf. & Inst. Code, § 14203; Cal. Code Regs., tit. 22, § 50004; 42 U.S.C. § 1396a(a)(5); 42 C.F.R. §§ 431.1, 431.10 (2021).)

Among the services covered under the Medi-Cal program are those provided by FQHC's, community-based health care providers that receive federal grant funding for furnishing primary and specialty care services in medically underserved areas. (*Three Lower Counties, supra*, 498 F.3d at p. 297; Welf. & Inst. Code, § 14132.100, subd. (a); 42 U.S.C. §§ 254b, 1396a(a)(15) & (bb), 1396d(a)(2)(C) & (*l*)(2).) The state is required to reimburse FQHC's for their covered Medi-Cal services. (42 U.S.C. § 1396a(bb).) Thus, FQHC's in California have two potential sources of compensation: federal grants for providing services not covered by Medi-Cal to medically underserved communities, and state reimbursements for providing covered services to qualified Medi-Cal beneficiaries. (See *Legacy Cmty. Health Servs. v. Smith* (5th Cir. 2018) 881 F.3d 358, 363; *Cmty. Health Care Assn. of N.Y. v. Shah* (2d Cir. 2014) 770 F.3d 129, 136; *Alameda Health Sys. v. Ctrs. for Medicare & Medicaid Servs.* (N.D.Cal. 2017) 287 F.Supp.3d 896, 902; 42 U.S.C. § 254b(k)(3)(F); 42 C.F.R. §§ 413.5, 413.9(b) (2021).)

The Medi-Cal program uses a prospective "per-visit" rate to reimburse FQHC's for services provided to qualified Medi-Cal beneficiaries. (Welf. & Inst. Code, § 14132.100, subd. (c).) An average "per-visit" rate is determined by dividing the FQHC's total "allowable" costs by the number of patient visits.[1] (*Three Lower Counties, supra*,

---

[1] Although the law contemplates alternative methods of calculating an FQHC's reimbursement rate, this is the method used by Family Health in connection with its change-in-scope-of-service request in this case. (Welf. & Inst. Code, § 14132.100, subd. (i).)

498 F.3d at p. 298; 42 U.S.C. § 1396a(bb).)  The FQHC's reimbursement is then calculated by multiplying the actual number of patient "visits" by the fixed per-visit rate. (*Three Lower Counties*, at p. 298; Welf. & Inst. Code, § 14132.100, subds. (c) & (g).)

An FQHC's "allowable" costs are determined in accordance with applicable Medicare cost principles, as described in part 413 of title 42 of the Code of Federal Regulations, and as further interpreted by the Centers for Medicare & Medicaid Services Publication 15-1, The Provider Reimbursement Manual (hereafter, the "PRM").  (Welf. & Inst. Code, § 14132.100, subds. (e)(1) & (i)(2)(B)(ii); *Oroville Hospital v. Department of Health Services* (2006) 146 Cal.App.4th 468, 472; see also *Community Care Foundation v. Thompson* (D.D.C. 2006) 412 F.Supp.2d 18, 22-23 [PRM entitled to high degree of deference as interpretations of Medicare regulations].)

Medicare cost principles state that payments to providers must be based on the reasonable cost of covered services related to the care of beneficiaries.  (42 C.F.R. §§ 413.9(a), (b) & (c)(3) (2021); PRM §§ 2100, 2102.1, 2102.2, 2102.3, 2103 (rev. 454, 09-12).)  Reasonable cost includes all "necessary and proper" costs incurred in rendering services.  (42 C.F.R. §§ 413.5(a), 413.9(a), (b) & (c)(3) (2021); PRM § 2100 (rev. 454, 09-12).)  Necessary and proper costs are those "that are appropriate and helpful in developing and maintaining the operation of patient care facilities and activities," and are "usually . . . common and accepted occurrences in the field of the provider's activity." (42 C.F.R. § 413.9(b)(2) (2021); PRM § 2102.2 (rev. 454, 09-12).)  Reasonable cost takes into account both direct and indirect costs, including, without limitation, administrative overhead.  (42 C.F.R. §§ 413.5(c), 413.9(c)(3), 413.102, 413.134, 413.153, 413.157 (2021); PRM §§ 2102.2 (rev. 454, 09-12), 2150 (rev. 315, 12-84), 2150.2 (rev. 315, 12-84).)

Cost reimbursement principles require providers to maintain and produce cost data, based on financial and statistical records that are current, accurate, and have sufficient detail to determine the costs payable under the program.  (42 C.F.R. §§ 413.20,

4

413.24 (2021); PRM §§ 2300, 2304 (rev. 336, 08-86); *Redding, supra*, 75 Cal.App.4th at p. 481.) Standard accounting principles and reporting practices must be followed. (42 C.F.R. § 413.20(a) (2021).)

It is the intent of the program to reimburse providers for all costs reasonably incurred in treating program beneficiaries—but only those costs. (42 U.S.C. § 1396a(bb)(2); see *Three Lower Counties, supra*, 498 F.3d at p. 298; *Chase Brexton Health Services Inc. v. Maryland Dept. of Health & Mental Hygiene* (D.Md. Dec. 15, 2006, No. MJG-03-1548) 2006 WL 6593814, at *2.) The regulations seek to avoid cost shifting between program beneficiaries and nonbeneficiaries. (42 C.F.R. §§ 413.5, 413.9(b)(1), 413.50(b) (2021); PRM § 2102.1 (rev. 454, 09-12); *Charter Peachford Hospital, Inc. v. Bowen* (11th Cir. 1986) 803 F.2d 1541, 1544.) Thus, after determining what costs are allowable, the regulations require the total allowable costs to be apportioned between program beneficiaries and other patients so that the share borne by the program is based upon the services received by program beneficiaries. (*Charter Peachford, supra*, 803 F.2d at pp. 1544-1545; *Visiting Nurse Assn. v. Thompson* (E.D.N.Y. 2004) 378 F.Supp.2d 75, 81; 42 C.F.R. §§ 413.50, 413.53 (2021); PRM §§ 2200.1 (rev. 406, 08-98), 2202.3 (rev. 245, 01-81).)

In general, cost data must be based on an approved method of cost finding, the process used to determine the total costs of services rendered through the assignment of direct costs and apportionment of indirect costs. (*Redding, supra*, 75 Cal.App.4th at p. 481; 42 C.F.R. § 413.24(b)(1) (2021); PRM §§ 2300, 2302.7, 2306, 2307 (rev. 336, 08-86).) The federal regulations provide guidance on cost finding methods and principles. (42 C.F.R. § 413.24(d) (2021).)

In this case, the Department applied the cost finding methodology described in subdivision (d)(7) of part 413.24 of title 42 of the Code of Federal Regulations, which provides, in relevant part: "The costs that a provider incurs to furnish services to free-standing entities with which it is associated are not allowable costs of that provider. Any

5

costs of services furnished to a free-standing entity must be identified and eliminated from the allowable costs of the servicing provider, to prevent . . . payment to that provider for those costs. This may be done by including the free-standing entity on the cost report as a nonreimbursable cost center for the purpose of allocating overhead costs to that entity. If this method would not result in an accurate allocation of costs to the entity, the provider must develop detailed work papers showing how the cost of services furnished by the provider to the entity were determined. These costs are removed from the applicable cost centers of the servicing provider. (42 C.F.R. § 413.24(d)(7) (2021).)

The PRM gives examples of how to allocate indirect costs associated with nonallowable cost centers, such as a gift or coffee shop. (PRM § 2328(D) (rev. 414, 05-00).) It provides: "Where cost centers are maintained for these functions . . . , the cost should be carried forward for cost finding and receive an allocable share of general service costs. After the allocation is made, the total cost of these functions must be excluded in determining reimbursable costs. . . . Where the costs (direct and allowable share of general service costs) attributable to any nonallowable cost area are so insignificant as to not warrant establishment of a nonreimbursable cost center, these costs may be adjusted on the Adjustments to Expenses worksheet of the cost reporting forms." (PRM § 2328(D), (rev. 414, 05-00).)

The statutory scheme requires the Department to audit cost reports submitted in connection with a requested adjustment to a per-visit rate based on a change in the scope of services. (Welf. & Inst. Code, §§ 14132.100, subd. (i)(2)(B)(*i*), (i)(3)(C), 14170.) The purpose of the audit is to substantiate and adjust the FQHC's actual, allowable costs per visit based on the Medicare reasonable cost principles. (Welf. & Inst. Code, §§ 14132.100, subd. (i)(2)(B)(*i*), (*ii*), (i)(3)(C); Cal. Code Regs., tit. 22, §§ 51016, subd. (a)(2), (6), 51021.)

If the FQHC disagrees with the audit findings, an administrative appeal procedure is available to review any disputes. (Welf. & Inst. Code, § 14171; Cal. Code Regs., tit.

6

22, § 51017 et seq.)  At an appeal hearing, the Department has the burden of producing evidence sufficient to make a prima facie case that the audit findings were correctly made.  Once the Department has presented such a prima facie case, the burden shifts to the provider to demonstrate, by a preponderance of the evidence, that its position regarding the disputed issues is correct.  (Cal. Code of Regs., tit. 22, § 51037, subd. (i).)

B.    *Factual and procedural background*

On or about December 1, 2014, Family Health submitted a request to adjust its prospective per-visit reimbursement rate based on a change in the scope of services for the fiscal period ending June 30, 2014.  Family Health included a consolidated cost report for eight FQHC clinics as well as a separate home office cost report.[2]

In the clinic cost report, Family Health identified certain costs that were not allowable under Medi-Cal because they were associated with nonreimbursable services, namely:  (1) $732,637 in physician salaries and benefits related to inpatient hospital OB services; (2) $2,766,253 in subcontracted medical services; and (3) $924,953 in subcontracted homeless services.  Because these costs were not allowable, Family Health excluded them from its clinic cost report.

During its audit, however, the Department determined that excluding the nonallowable costs from the cost report was not the proper approach.  Rather, because the costs had a substantive, material connection to clinic operations, the Department determined they should remain in the cost report in a nonreimbursable cost center, thereby absorbing a proportionate share of the clinics' total overhead costs.  The net effect of this change was to reduce Family Health's total allowable costs and reduce its adjusted per-visit reimbursement rate.  Based on the audit, the Department set a per-visit

---

[2]    Because the clinic sites are classified as a consolidated group, a single per-visit rate was calculated and applied to all the clinic sites.

7

rate of $207.55, an increase from the preexisting rate of $182.06, but lower than the rate of $221.52 sought by Family Health.

Family Health appealed the Department's cost adjustments, contending the disputed amounts were appropriately excluded from its clinic cost report. After a formal administrative hearing, the administrative law judge (ALJ) issued a proposed decision upholding the Department's audit findings. The Chief ALJ subsequently adopted the proposed decision as the final administrative decision.

Thereafter, Family Health filed a petition for writ of mandate seeking review of the administrative decision. The superior court denied the petition and entered judgment in favor of the Department. This appeal followed.

DISCUSSION

I

*Standard of Review*

"When reviewing the denial of a petition for writ of administrative mandate under Code of Civil Procedure section 1094.5, we ask whether the public agency committed a prejudicial abuse of discretion. 'Abuse of discretion is established if the [public agency] has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence.' [Citations.]" (*County of Kern v. State Dept. of Health Care Services* (2009) 180 Cal.App.4th 1504, 1510.)

In determining whether the administrative findings are supported by the evidence, the scope of our review is the same as the trial court. (*Hi-Desert Medical Center v. Douglas* (2015) 239 Cal.App.4th 717, 730.) We review the entire administrative record to determine whether the agency's findings are supported by substantial evidence. (*Ibid*.; Code Civ. Proc., § 1094.5, subd. (c).) " 'We do not reweigh the evidence; we indulge all presumptions and resolve all conflicts in favor of the [agency's] decision. Its findings come before us "with a strong presumption as to their correctness and regularity." [Citation.] We do not substitute our own judgment if the [agency's] decision " ' "is one

8

which could have been made by reasonable people. . . .” [Citation.]’ ” ’ [Citations.]” (*California Youth Authority v. State Personnel Bd.* (2002) 104 Cal.App.4th 575, 584; accord, *Oak Valley Hospital Dist. v. State Dept. of Health Care Services* (2020) 53 Cal.App.5th 212, 224.)  If a finding is supported by substantial evidence, we may not disregard or overturn it merely because a contrary finding would have been equally or more reasonable.  (*Boreta Enterprises, Inc. v. Department of Alcoholic Beverage Control* (1970) 2 Cal.3d 85, 94; *Boling v. Public Employment Relations Bd.* (2018) 5 Cal.5th 898, 912.)

The interpretation of a regulation or a statute is, of course, a question of law. While an administrative agency's interpretation of the laws it is charged with enforcing may be entitled to deference, the court is the ultimate arbiter of the interpretation of the law.  (*Spanish Speaking Citizens' Foundation, Inc. v. Low* (2000) 85 Cal.App.4th 1179, 1214; *McCormick v. County of Alameda* (2011) 193 Cal.App.4th 201, 207-208; *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7-8, 12, 14; *Villanueva v. Fidelity National Title Co.* (2021) 11 Cal.5th 104, 122-123.)

Family Health, as the party challenging the administrative decision, bears the burden of demonstrating there was a prejudicial abuse of discretion.  (*Elizabeth D. v. Zolin* (1993) 21 Cal.App.4th 347, 354.)

II

*Use of "Materiality" Standard*

This case involves the question of how costs of certain nonreimbursable services should be treated in the Family Health clinics' Medi-Cal cost report, namely, whether the costs should be directly eliminated, as Family Health proposed in its cost report, or reclassified into a nonreimbursable cost center, as the Department determined in its audit. In the administrative decision, the ALJ concluded that the answer to this question turns on the strength, or materiality, of the connection between the nonreimbursable services and the clinics' onsite operations.  If the clinics provided "material" support for the

9

nonreimbursable services, then, the ALJ concluded, a portion of the clinics' indirect (overhead) costs properly should be allocated to such services by means of a nonreimbursable cost center.

On appeal, Family Health argues the ALJ erred by using a "materiality" standard, which it contends is both impermissibly subjective and legally unsupported.

As a preliminary matter, we conclude that Family Health has forfeited this argument by failing to raise it below. " ' "[I]t is fundamental that a reviewing court will ordinarily not consider claims made for the first time on appeal which could have been but were not presented to the trial court." ' " (*Kashmiri v. Regents of University of California* (2007) 156 Cal.App.4th 809, 830.) " 'Appellate courts are loath to reverse a judgment on grounds that the opposing party did not have an opportunity to argue and the trial court did not have an opportunity to consider. [Citation.] In our adversarial system, each party has the obligation to raise any issue or infirmity that might subject the ensuing judgment to attack. [Citation.] Bait and switch on appeal not only subjects the parties to avoidable expense, but also wreaks havoc on a judicial system too burdened to retry cases on theories that could have been raised earlier.' [Citation.]" (*Ibid.*; accord, *Fair Political Practices Com. v. Californians Against Corruption* (2003) 109 Cal.App.4th 269, 281.)

In this case, Family Health challenged the sufficiency of the evidence to support the materiality findings, but it did not raise any challenge to the materiality standard itself, and it offers no reason for its failure to do so. Accordingly, we conclude Family Health has forfeited the issue.

But even if the argument were not forfeited, we still would reject the claim on the merits. The ALJ did not err in using a "materiality" standard when assessing whether the nonreimbursable services bore a sufficient connection to clinic operations to require an allocation of overhead costs.

As discussed, payments to providers must be based on the reasonable cost of services related to the care of Medi-Cal beneficiaries. (*Redding, supra*, 75 Cal.App.4th at

10

p. 481.)  Under the regulations, reasonable cost includes all necessary and proper expenses incurred in furnishing covered services to beneficiaries, including both direct and indirect costs.  (42 C.F.R. §§ 413.5(a), 413.9(b) & (c)(3) (2021); PRM § 2102.2 (rev. 454, 09-12).)  Although the regulations may not use the term "material," the objective of the regulations is to apportion the total allowable costs of a provider between program beneficiaries and other patients so that the costs with respect to individuals covered by the program will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by the program.  (*Redding*, at p. 481; 42 C.F.R. §§ 413.9(b)(1), 413.50(b), 413.53(a) (2021); PRM §§ 2102.1 (rev. 454, 09-12), 2202.3 (rev. 245, 01-81).)  Thus, the regulations are focused on the connection between a provider's costs and its reimbursable services.

Where a provider has engaged in both reimbursable and nonreimbursable services, the regulatory scheme requires the Department to determine how much of the provider's costs, both direct and indirect, should be allocated to the nonreimbursable services to avoid cost shifting between program beneficiaries and other patients.  The ALJ's references to materiality simply carry out this inquiry, asking whether the nonreimbursable services bore a sufficient (i.e., significant or material) connection to the clinics' onsite activities such that a portion of the clinics' overhead costs properly should be allocated to them.  We find this approach entirely consistent with the regulatory cost-finding methodology.  (See, e.g., PRM § 2328(D) (rev. 414, 05-00) [where nonallowable costs are "insignificant," they need not be carried forward to a nonreimbursable cost center].)  Indeed, Family Health's expert, Kelly Hohenbrink, used a materiality standard—or, more precisely, an immateriality standard—when opining that there was an insufficient basis to allocate a portion of the clinic overhead to the nonreimbursable subcontractor activities.

We do not find the concept of "materiality" to be impermissibly vague or subjective.  It is a widely used and well understood term, especially in the context in

11

which it was used.  Thus, we conclude the ALJ's focus on materiality was not an abuse of discretion.

III

*Reclassification of Inpatient OB Services*

In its audit, the Department determined that clinic staff were providing material support for nonreimbursable inpatient hospital OB services.  As a result, the Department reclassified the costs of such services to a nonreimbursable cost center, resulting in the disallowance of a proportionate share of clinic overhead costs.  The ALJ held that the Department correctly applied the cost-finding methodology to determine the overhead costs associated with the nonreimbursable services.

Family Health argues there is no substantial evidence in the record to support the ALJ's finding of a material connection between the inpatient OB services and the clinics' onsite operations and, therefore, the Department's audit adjustments improperly disallowed substantial amounts of overhead costs that have no relationship to the inpatient OB services.  We disagree.  Substantial evidence supports the Department's decision to reclassify the costs into a nonreimbursable cost center.  Such evidence includes the opinion of the Department's auditor, James Conklin, as well as the testimony of Family Health's own witnesses.

In conducting the audit, Conklin reviewed the hospital contract and concluded that the agreement demonstrated a material connection between the inpatient OB services and clinic operations.  Under the contractual arrangement, clinic physicians and staff would provide prenatal and postpartum care at the clinic, while clinic physicians would deliver the babies at the hospital.  However, the contract conferred on Family Health the responsibility to "manage" the labor, delivery, and postpartum care required for hospitalized patients, an arrangement that tracked with Conklin's general knowledge about how FQHC's typically provide labor and delivery services.  In addition, Conklin noted that Family Health provided and paid for call scheduling to notify physicians when

12

they were needed at the hospital. Based on Family Health's contractual arrangement with the hospital, Conklin testified that inpatient OB services were part of the continuity of care provided by the clinics, and that the clinics materially supported the inpatient labor and delivery services. This, in Conklin's opinion, required a proportional allocation of clinic overhead costs.

Family Health argues that Conklin's opinion was based on conjecture and speculation, but Family Health's witnesses supported Conklin's opinion. Fran Butler-Cohen, Family Health's chief executive officer, confirmed the interconnected nature of the clinics and the inpatient OB services and acknowledged that much of the support for hospital deliveries is done at the clinic level.

Kelly Hohenbrink, Family Health's expert witness, testified that inpatient OB activity is essentially a "wholly owned activity" of the health center and, based on that, he agreed with the auditor that "elimination of the cost [from the cost report] was not appropriate." He unequivocally testified that "some portion of overhead" should be allocated to the inpatient OB activity. Likewise, in its administrative hearing briefs, Family Health conceded that inpatient OB services should absorb a "reasonable portion of overhead." Family Health merely argued that the Department's nonreimbursable cost center approach was not an appropriate methodology for achieving an accurate allocation of overhead pertaining to the OB services. Instead, Hohenbrink and Family Health argued, the "most accurate" result would be achieved by directly eliminating a reasonable amount of overhead from the home office cost report.

The Department's auditor rejected Family Health's proposal to adjust the home office cost report, concluding that the documentation submitted was not sufficient to support the change. The ALJ (and the trial court) agreed with the Department, noting that (1) the inpatient OB services were part of the clinics' care continuum; (2) the costs of such services were reported by Family Health on the clinic cost report, not the home office cost report; and (3) Family Health failed to submit "detailed work papers" to

13

support an alternative costing methodology. The ALJ's reasoning was sound and the finding is supported by substantial evidence. Indeed, the evidence shows that at the time of the administrative hearing, Family Health continued to report the inpatient OB service costs at the clinic level. And Family Health has made no attempt in its briefs to show it provided sufficient detail to support an alternative costing methodology.

In addition, before the audit was finalized, Ricardo Roman, Family Health's chief financial officer, sent the Department an e-mail in which he agreed with the reclassification of inpatient OB services to a nonreimbursable cost center in the clinic cost report. Roman subsequently testified at the hearing that his e-mail did not accurately convey the position of Family Health. The ALJ, however, found Roman's testimony at the hearing "not credible." When applying the substantial evidence standard, we do not reexamine the credibility of witnesses. (*Doe v. Regents of University of California* (2016) 5 Cal.App.5th 1055, 1073.) Thus, although not dispositive, Roman's e-mail is additional evidence that bolsters the ALJ's finding.

In sum, we conclude there is substantial evidence in the record to support the finding of a material connection between clinic operations and the nonreimbursable inpatient OB services, resulting in the need for an allocation of overhead costs. Applying the relevant cost-finding methodology, the Department properly reclassified the costs to a nonreimbursable cost center in the clinic cost report. (42 C.F.R. § 413.24(d)(7) (2021).)

To the extent Family Health contends the auditor's nonreimbursable cost center approach has resulted in a disproportionate allocation of overhead costs, we are unmoved. First, as the record shows, cost finding "is not an exact science." Second, if Family Health believed the auditor's approach resulted in an inaccurate allocation of costs, it was incumbent on Family Health to provide "detailed work papers" to demonstrate that an alternative cost-finding procedure (such as discrete costing) would provide a more accurate allocation. (42 C.F.R. § 413.24(d)(7) (2021).) As the ALJ and the trial court found, Family Health failed to meet that burden.

IV

*Journal Entries*

In addition to the costs for inpatient OB services, the Department reclassified into a nonreimbursable cost center $3,691,206 in subcontractor costs, consisting of $2,766,253 in medical subcontractor costs and $924,953 in homeless services costs. Family Health argues that approximately $1.3 million of that amount ($913,210 for medical subcontractors and $436,640 for homeless services) was improperly reclassified because the figures were derived from accounting "journal entries" and did not represent true "costs." We are unpersuaded. There is substantial evidence to support the ALJ's finding that the reclassified amounts in question were, in fact, costs.

Contrary to Family Health's contention, Conklin testified that he did not use the journal entries as part of his audit reclassification. He only used actual cost figures pulled directly from Family Health's cost report. Conklin testified that there was no basis for noncost journal entries to be included in a cost report, and there was nothing in Family Health's cost report to suggest that any of the reported costs were not actual costs.

The cost report and audit working papers support Conklin's testimony. In its cost report, Family Health identified and then eliminated $2,766,253 in "Other Costs" related to "Outside Sub-Contractors—Medical," and $924,953 in "Non-reimbursable Costs" related to "Outside Sub-Contractors—HOMELESS." Family Health has never explained why it included such amounts in its cost report if, as Family Health now contends, they were nothing more than fictitious accounting entries. Family Health's own expert (Hohenbrink) testified that there is no reason for noncost journal entry amounts to be included in a cost report.

That Family Health also recorded the amounts in its accounting journals proves nothing, since the journals should provide a complete record of all the provider's financial transactions, both revenues and expenses. Such evidence certainly does not prove that the auditor must have improperly included noncost journal entries in his audit

15

adjustments. The evidence is to the contrary. Family Health specifically identified and then directly eliminated the costs from its cost report. The elimination of those costs is what triggered the audit.

Further, the argument that the amounts were eliminated because they represent a "duplication" of costs in the cost report, as Hohenbrink testified, makes little sense. If the costs were "doubl[ed] up on the cost [report]," then Family Health's adjustment to its cost report would have been twice as large, because it would need to eliminate both the original cost—which Family Health admits was not allowable—*and* the duplicated cost. This obviously did not occur.

On this record, the ALJ appropriately rejected Family Health's journal entries argument.

V

*Homeless Services Costs*

Family Health argues there is no substantial evidence to support the Department's reclassification of $924,953 in homeless services costs. However, Family Health's discussion of the issue in its opening brief is patently deficient. The argument takes up only one-half of a page of its brief, includes no citations to the record or legal authority, and fails to discuss any evidence favorable to the other side and show why it is lacking. (*In re S.C.* (2006) 138 Cal.App.4th 396, 408; *Singh v. Lipworth* (2014) 227 Cal.App.4th 813, 817; *Paulus v. Bob Lynch Ford, Inc.* (2006) 139 Cal.App.4th 659, 685; *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881; *State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, 749; Cal. Rules of Court, rule 8.204(a)(1)(B) & (C).) We therefore consider the issue forfeited and affirm on that basis.[3]

---

[3]     Even if we were to treat the argument as properly presented, the argument lacks merit. The record indicates that nearly half of Family Health's homeless services costs stemmed from services provided by Family Health staff inside Family Health's clinics.

16

## VI

### *Medical Subcontractor Costs*

Family Health also argues the evidence was insufficient to find a material connection between the nonreimbursable subcontracted medical services and its clinics' onsite operations. We conclude, however, that substantial evidence supports the Department's reclassification of the subcontracted medical costs.

Conklin testified that during his audit he reviewed 30 to 40 contracts looking for indications of the relationship between Family Health and its subcontractors. He discovered that most of the contracts used the same standard language. As a result, Conklin focused his testimony on two "representative" sample contracts. But this does not undermine the strength of his testimony about the other contracts, all of which were admitted into the administrative record.

Based on his review of the contracts, Conklin testified that the language of the contracts demonstrated significant interaction between subcontractors and clinic staff, including periodic staff meetings; data collection, coordination, and reporting; and substantive communications tied to program implementation. We agree.[4]

For example, Family Health's contract with Motiva Associates provides that (1) Family Health will provide orientation and ongoing consultation to ensure the subcontractor's ability to fulfill its duties under the agreement; (2) the subcontractor will

---

The record demonstrates a material connection between the services and clinic resources, and therefore the Department properly reclassified the costs to a nonreimbursable cost center to absorb a portion of the clinic overhead. Family Health failed to meet its burden to show that an alternative cost-finding procedure would have provided a more accurate allocation.

[4] Family Health argues that Conklin's testimony is not substantial evidence because he uses "weasel words" to hedge his testimony. However, the Department did not rely solely on Conklin's testimony; it also presented the contracts, which speak for themselves.

17

provide routine written progress reports to Family Health; (3) the subcontractor shall cooperate with Family Health in the development and implementation of an evaluation program; (4) the subcontractor will attend and participate in regional meetings, plus additional meetings as necessary to address program issues; (5) the subcontractor will communicate with Family Health's "care coordination" team on an ongoing basis about treatment services; and (6) the subcontractor will work with Family Health staff to ensure timely collection, evaluation, and reporting of required data. Family Health's contracts with Home Start Inc., delibrainy LLC, UCSD Shiley Eye Center, St. Vincent de Paul Village, Inc., and the YMCA of San Diego County—Childcare Resource Service, contain virtually identical provisions. In some instances, the contracts provided that subcontractor services would be performed at Family Health clinics.

Standard contracts relating to HIV prevention services likewise required subcontractors to (1) submit monthly reports; (2) meet with Family Health staff monthly or as otherwise "deemed necessary and appropriate"; (3) participate in annual site visits by Family Health staff; (4) advise Family Health of all press releases and media events related to the contracted services; and (5) assist project evaluation through the collection and reporting of data to Family Health program staff.

Another (third) set of standardized contracts, all of which involve the San Diego State University Research Foundation, contain similar provisions relating to meetings and communications with Family Health staff, data collection, and reports. Such contracts required Family Health to "maintain close liaison" with the subcontractor to assure a "well integrated effort."

Witnesses for Family Health confirmed that it complied with its contractual obligations. Thus, the record supports an inference that the contractually-required interactions occurred, supporting Conklin's testimony that there was a significant or material connection between the subcontractors and Family Health clinics.

Family Health argues that because the level of interaction between subcontractors and clinic staff was not quantified, it was too imprecise to support a finding of "materiality." Not so. Although such evidence would have been helpful, it was not necessary to demonstrate a material connection to clinic operations and resources. For example, the contracts involving San Diego State University Research Foundation clearly show that a substantial percentage of the subcontractor's total compensation was related to matters involving collaboration and communication with clinic staff.

The evidence was sufficient to find that clinic staff provided material support for the nonreimbursable subcontractor activities. Based on such evidence, the Department properly reclassified the medical subcontractor costs to a nonreimbursable cost center. And Family Health failed to present detailed work papers to justify an alternative cost-finding procedure. (42 C.F.R. § 413.24(d)(7) (2021).) Accordingly, we affirm.

## DISPOSITION

The judgment denying the petition for writ of mandate is affirmed. The Department shall recover its costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1) & (2).)

                                              KRAUSE            , J.

We concur:

     MURRAY            , Acting P. J.

     HOCH              , J.

19

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| FAMILY HEALTH CENTERS OF SAN DIEGO<br><br>Plaintiff and Appellant,<br><br>v.<br><br>STATE DEPARTMENT OF HEALTH CARE SERVICES,<br><br>Defendant and Respondent. | C090618<br><br>(Super. Ct. No. 34-2018-80002952-CU-WM-GDS)<br><br>ORDER CERTIFYING OPINION FOR PARTIAL PUBLICATION |

THE COURT:

The opinion in the above entitled matter filed on October 7, 2021, was not certified for publication in the Official Reports. For good cause it now appears that the opinion, with the exception of parts III through VI, should be published in the Official Reports, and it is so ordered.

1

EDITORIAL LISTING

APPEAL from a judgment denying a petition for writ of mandate of the Superior Court of Sacramento County, James P. Arguelles, Judge. Affirmed.

Murphy, Campbell, Alliston & Quinn, George E. Murphy; Douglas S. Cumming Law Office and Douglas S. Cumming for Plaintiff and Appellant.

Rob Bonta, Attorney General, Matthew Rodriguez, Acting Attorney General, Cheryl L. Feiner, Assistant Attorney General, Gregory D. Brown and Kevin L. Quade, Deputy Attorneys General, for Defendant and Respondent.

BY THE COURT:

    MURRAY    , Acting P. J.

    HOCH    , J.

    KRAUSE    , J.

2